**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PHILIP ELIADES, JONATHAN SWABY,
JOHN BOISI, and NATHAN OBEY,

       Plaintiffs,

v.

GRUBHUB INC., UBER TECHNOLOGIES,
INC., and POSTMATES INC.,

       Defendants.

No. _____

**JURY TRIAL DEMANDED**

<u>**CLASS ACTION COMPLAINT**</u>

Plaintiffs, Philip Eliades, Jonathan Swaby, John Boisi, and Nathan Obey, individually and on behalf of all others similarly situated, bring this action against Grubhub Inc. ("Grubhub"), Uber Technologies, Inc. ("Uber"), and Postmates Inc. ("Postmates") and allege as follows:

## I.    <u>INTRODUCTION</u>

1.    Defendants have violated sections 1 and 2 of the Sherman Act and their state analogues by exploiting, without procompetitive justification, their dominant position in the fast-growing market for delivery and takeout through internet-based platforms that aggregate the offerings of multiple restaurants.

2.    Given the convenience these platforms offer, and because most restaurants face low profit margins and the subsequent need for volume to cover their costs, the increasing popularity of these platforms has in effect required vast numbers of restaurants to use them.

3.    Under those conditions, Defendants require any restaurant that sells its goods on Defendants' platforms to pay unreasonable commissions each time a consumer orders from that

restaurant through Defendants' platforms.  These commissions force restaurants to charge higher prices when they sell through Defendants' platforms to avoid losing money on each sale.

4.     In a freely competitive market, the restaurants would effectively offset these increased costs by having them paid by those consumers who choose the convenience of Defendants' platforms.  That is, absent restrictions, these restaurants would offer their customers different prices depending on whether they used Defendants' platforms or placed orders directly through the restaurant.

5.     Insulating their platforms, however, each Defendant contractually *prevents* the restaurants from offering lower prices for sales outside its platform.  For each Defendant, these restrictions apply to direct orders from the restaurants for takeout, delivery, or sit-down.  GrubHub and Uber apply these restrictions most broadly by preventing restaurants from charging lower prices for orders through similar platforms, such as DoorDash.  Defendants do this because if the restaurants were to offer lower prices for sales *outside* each Defendant's platform, then such pricing would reduce the restaurants' sales *on* the platform and reduce the Defendant's profits.

6.     These anticompetitive agreements prevent both restaurants and other platforms from competing with Defendants and thus force all consumers to pay supracompetitive prices.  The result of Defendants' conduct, in short, is that any restaurant using any Defendant's platform charges *all* of its customers supracompetitive prices.

7.     On behalf of a nationwide class of the customers of restaurants using these platforms, Plaintiffs bring this action to enjoin and to seek redress for this unlawful conduct.

## II.   **PARTIES**

### a. **Plaintiffs**

8.     Plaintiff Phil Eliades is a resident of New York, New York, and a citizen of New York.  Over the relevant period, he has ordered meals for takeout, delivery, and sit-down directly from restaurants that sell their goods through each Defendant's platform.  He has also placed orders through Restaurant Platforms from restaurants that sell through Defendants' platforms.

9.     Plaintiff Jonathan Swaby is a resident of New York, New York, and a citizen of New York.  Over the relevant period, he has ordered meals for takeout, delivery, and sit-down directly from restaurants that sell their goods through each Defendant's platform.  He has also placed orders through Restaurant Platforms from restaurants that sell through Defendants' platforms.

10.     Plaintiff John Boisi is a resident of Brooklyn, New York, and a citizen of New York.  Over the relevant period, he has ordered meals for takeout and sit-down directly from restaurants that sell their goods through Grubhub and Postmates.  He has also placed orders through Restaurant Platforms from restaurants that sell through Defendants' platforms.

11.     Plaintiff Nate Obey is a resident of Brooklyn, New York, and a citizen of New York.  Over the relevant period, he has ordered meals for takeout and sit-down directly from restaurants that sell their goods through Grubhub.  He has also placed orders through Restaurant Platforms from restaurants that sell through Defendants' platforms.

### b. **Defendants**

12.     Defendant Grubhub is a Delaware corporation with its principal place of business in Chicago, Illinois.  Grubhub says it "connects more than 300,000 restaurants with hungry diners

3

in thousands of cities across the United States and is focused on transforming the takeout experience." Grubhub's 2019 revenues were $1.31 billion.

13.     Defendant Uber is a Delaware corporation with a principal place of business in San Francisco, California. Uber says its Uber Eats service "allows consumers to search for and discover local restaurants, order a meal, and either pick-up at the restaurant or have the meal delivered." Uber's 2019 revenues from this service were $2.5 billion.

14.     Defendant Postmates is a Delaware corporation with a principal place of business in San Francisco, California. Postmates says it is "transforming the way goods move around cities through [its] revolutionary Urban Logistics platform that connects customers with local couriers who can deliver anything from your favorite restaurant or retailer within minutes." Postmates is not a public company; its reported valuation is approximately $2.4 billion.

15.     On July 6, 2020, Uber announced an agreement to acquire Postmates in a $2.65 billion all-stock takeover.

### III.     **JURISDICTION AND VENUE**

16.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because the matter in controversy exceeds the value of $5,000,000, exclusive of interests and costs, and is a class action in which any member of a class of plaintiffs is a citizen of a State different from any defendant. This Court also has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. § 15.

17.     Venue lies within this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Defendants resided, transacted business, were found or had agents in this District, and a substantial portion of the alleged activity affected interstate trade and commerce in this District.

18.     This Court has personal jurisdiction over Defendants because this action arises out of Defendants' conduct in this District.

## IV.     FACTUAL ALLEGATIONS

### a. The Relevant Markets

19.     Coupled with the already increasing frequency with which restaurants had come to offer takeout and delivery service, the advent of the internet even further changed the food industry.  Instead of calling a restaurant to place an order for takeout or delivery, customers could order on the restaurant's website menu.

20.     Defendant Grubhub was one of the first companies to build and operate an online platform through which restaurant menus in a particular region are aggregated to allow consumers to view available pickup or delivery options all at once.

21.     These "Restaurant Platforms" enable consumers to search for participating restaurants in a particular locality and order food for takeout or delivery from those restaurants. Restaurant Platforms also deliver food for participating restaurants that do not want to provide delivery themselves.

22.     In aggregating the offerings of multiple restaurants in a single place, Restaurant Platforms provide a service distinct from a restaurant's website or app (*e.g.*, a Domino's pizza app), which simply allow a consumer to place an order from a single restaurant.

23.     Restaurant Platforms thus compete with each other in the product market for takeout and delivery orders from Restaurant Platforms (the "Restaurant Platform Market").

24.     Restaurant Platforms also compete in the product market for takeout and delivery orders from restaurants (the "Takeout and Delivery Market").  That is, by providing a channel

through which consumers may order takeout and delivery from restaurants, Restaurant Platforms compete directly with the restaurants themselves for such orders.

25.     A recent survey from *Restaurant Owners* indicates that more than 25% of independent restaurants have their own delivery fleets.  These restaurants could accept orders from, and provide delivery to, consumers without any assistance from Restaurant Platforms.

26.     In addition, as explained further below, although Restaurant Platforms do not directly participate in the product market for sit-down meals at restaurants (the "Sit-Down Market"), Restaurant Platforms substantially affect that market through their dealings with restaurants.  The Sit-Down Market is distinct from the Takeout and Delivery Market because, for a consumer who wants to eat at home, a meal at a restaurant is not a reasonable substitute.

### b.  The Restaurant Platform Market

27.     Although a number of firms participate in the Restaurant Platform Market, the market is dominated by just four firms:  DoorDash, Grubhub, Uber, and Postmates.

28.     According to data compiled by Vox, these firms control *98% of the Restaurant Platform Market* in the United States.

29.     Vox found that, as of November 2019, DoorDash's national share of the market was 37%, Grubhub's share was 31%, Uber's share was 20%, and Postmates' share was 10%.  This data underestimates Uber's market share, because beginning in May 2019, some Uber Eats transactions became indistinguishable from Uber Rides transactions.

30.     These market shares vary significantly across metropolitan areas.  As *The Atlantic* has observed, Restaurant Platforms have "split their dominance regionally, like cable companies."  Grubhub, for example, controls 67% of the market in New York City, 4.5 times as much as its closer competitor in that market.  Vox has summarized estimated shares in other markets:

| | DoorDash | Grubhub | Uber Eats | Postmates | Size of #1 vs #2 | Leader |
|---|---|---|---|---|---|---|
| NYC | 15% | 67% | 14% | 4% | 4.5x | Grubhub |
| SF Bay Area | 63% | 16% | 13% | 8% | 3.9x | DoorDash |
| Miami | 16% | 11% | 55% | 19% | 2.9x | Uber Eats |
| Houston | 58% | 9% | 29% | 4% | 2.0x | DoorDash |
| Phoenix | 39% | 15% | 23% | 23% | 1.7x | DoorDash |
| Dallas Fort Worth | 53% | 12% | 32% | 4% | 1.7x | DoorDash |
| Washington DC | 43% | 22% | 28% | 7% | 1.5x | DoorDash |
| Boston | 30% | 41% | 26% | 4% | 1.4x | Grubhub |
| Los Angeles | 29% | 19% | 15% | 37% | 1.3x | Postmates |
| Chicago | 34% | 37% | 24% | 6% | 1.1x | Grubhub |
| Philadelphia | 39% | 42% | 16% | 3% | 1.1x | Grubhub |
| Atlanta | 38% | 12% | 40% | 10% | 1.1x | Uber Eats |

31.     This result is the natural consequence not only of so-called indirect network effects, as explained below, but also of Defendants' anticompetitive conduct.

### c.  The Business of Restaurant Platforms

32.     Restaurant Platforms are two-sided platforms, acting as an intermediary to connect restaurants and consumers to the benefit of both.

33.     In its most recent 10-K, Grubhub describes its business as follows:  "The Company connects more than 300,000 restaurants with hungry diners in thousands of cities across the United States and is focused on transforming the takeout experience."

34.     In its most recent 10-K, Uber similarly describes its business as follows:  "Our Eats offering allows consumers to search for and discover local restaurants, order a meal, and either pick-up at the restaurant or have the meal delivered."

35.     Postmates, on its website, likewise describes itself as follows:  "Postmates is transforming the way goods move around cities through [its] revolutionary Urban Logistics platform that connects customers with local couriers who can deliver nearly anything from your favorite restaurant or retailer in minutes."

36.     Grubhub, Uber, and Postmates, like other Restaurant Platforms, not only connect restaurants and consumers, but also derive revenue from both restaurants and consumers.

37.     <u>Restaurant Commission</u>.  When a customer orders from a restaurant through a Restaurant Platform, the platform typically charges the restaurant a commission (the "Restaurant Commission").  The Restaurant Commission is typically equal to a rate (the "Restaurant Commission Rate") multiplied by the total price of the order, based on the prices—which the restaurant typically chooses—listed on the Restaurant Platform (the "Restaurant List Price").

38.     If the restaurant does not provide its own delivery, the total price is the listed price of the goods ordered (*e.g.*, the total price of two burgers, one order of fries, and a soda).  If the restaurant does provide its own delivery, the total price is the listed price of the goods ordered plus the delivery fees the restaurant charges.  Defendants typically charge a 30% Restaurant Commission Rate to restaurants that do not provide their own delivery, and a lower Restaurant Commission Rate for restaurants that do provide their own delivery and for takeout orders.

39.     <u>Consumer Commission</u>.  A Restaurant Platform also charges consumers a service fee (the "Consumer Commission").  The Consumer Commission is also typically equal to a commission rate (the "Consumer Commission Rate") multiplied by the total listed price of the order.  The Consumer Commission Rate is typically between 5% and 10%.  In some cases, Restaurant Platforms charge no Consumer Commission Rates for orders from restaurants that provide their own deliveries and for takeout orders.

40.     <u>Consumer Delivery Fee</u>.  Restaurant Platforms also typically charge the consumer a delivery fee for orders from restaurants that do not provide their own delivery (the "Consumer Delivery Fee").  The Consumer Delivery Fee is typically about 5%.

41.     The following is an example of the fees the Restaurant Platforms charge:

|  | Scenario A: Restaurant Platform provides delivery | Scenario B: Restaurant provides delivery | Scenario C: Takeout orders |
|---|---|---|---|
| Restaurant List Price | $50.00 | $50.00 | $50.00 |
| Restaurant's delivery price | n/a | $2.00 | n/a |
| Restaurant Commission Rate | 30% | 20% | 15% |
| Restaurant Commission | $15.00 | $10.40 | $7.50 |
| Consumer Commission Rate | 5% | 0% | 0% |
| Consumer Commission | $2.50 | $0.00 | $0.00 |
| Consumer Delivery Fee | $2.50 | $0.00 | $0.00 |
| Total Charged to Consumer | $55.00 | $52.00 | $50.00 |
| Total Revenue for Restaurant Platform | $20.00 | $10.40 | $7.50 |

### d. Defendants Use MFNs to Control Restaurant Prices

42.     Defendants have leveraged their position in the relevant markets to force restaurants to enter into agreements that contain most-favored nation provisions ("MFNs").

43.     In general, MFNs imposed by a platform prohibit a supplier that sells through that platform from charging lower prices when that supplier sells through other channels.  MFNs may be broadly categorized as "narrow" or "wide."  In a "narrow MFN," the platform prohibits the supplier from selling its goods at a lower price when the supplier sells to consumers directly, as opposed to through the platform or some other non-direct channel.  In a "wide MFN," the platform prohibits the supplier from selling its goods at a lower price when the supplier sells through *any* channel other than through the platform.

44.     Postmates imposes narrow MFNs on restaurants that sell through Postmates. Postmates's MFN states:  "Pricing shall be consistent with Merchant's in-store pricing."  That is, "Postmates insists on price parity between in-store and online menus."

45.     As a result, any restaurant that sells goods through Postmates is contractually prohibited from selling those goods at a lower price to consumers who purchase directly from that restaurant, regardless of whether the meal is for takeout, delivery, or sit-down, and regardless of

whether that meal was ordered online, by phone, or in person.  The restaurant may, however, charge a lower price when it sells its goods through a competing platform, such as Doordash.

46.     Grubhub and Uber both impose wide MFNs.  These provisions prohibit restaurants from selling at lower prices directly to consumers (regardless of whether the meal is for takeout, delivery, or sit-down, and regardless of whether that meal is ordered online, on the phone, or in person); or to consumers through any competing Restaurant Platform.  In short, for a restaurant that sells through Grubhub or Uber, the restaurant's Restaurant List Price is the *lowest price* the restaurant is permitted to charge.

47.     Grubhub's MFN states:  "The item pricing must be at least as favorable to the consumer as that which is available for Restaurant's standard menu or offered to any 3rd party service."  Consistent with this provision, Grubhub boasts (in its 2019 10-K) that it offers "menu price parity with any other online ordering option."

48.     Uber's MFN states:  "Merchant may not make any Item available to Customers through the Eats App at a price that is higher than the price that Merchant charges in-store for similar Items.  Merchant agrees that you will not make an Item available under this Agreement at a price higher than the amount Merchant is charging for similar Items through any comparable platform for food delivery services."

49.     The Restaurant Platform industry as a whole demonstrates that Defendants' MFNs are not necessary.  Doordash, for example, does not impose these restrictions on restaurants that sell through its platform.  Public reporting on Doordash highlights this distinction:

> "For a very long time GrubHub forced stores to sell at the exact same menu price that they offered in store – exactly what you're mentioning.  But then DoorDash came out and said, 'Hey restaurant, you do whatever you want for your pricing, if you want to sell it on DoorDash at 10%, 15% higher, so forth.'  So, lot[s] of restaurant

clients really liked DoorDash as they could increase their prices to recover commission costs."

50.     A 2016 *Bloomberg* article similarly reported:  "An explanation for DoorDash's price discrepancies can be found in a support document within the help section of the company's website.  It says partner restaurants may choose to charge customers more to make up for commissions paid to the delivery company."

51.     Defendants' MFNs have forced consumers who purchase from restaurants directly or from other Restaurant Platforms to pay supracompetitive prices; have enabled Defendants to continue offering subpar technology and service; and have caused Restaurant Commission Rates to increase to such a degree that restaurants have been forced out of business.  Defendants' MFNs are anticompetitive and do not have any procompetitive justification.

### e.  Competition in the Restaurant Platform Market

52.     Restaurant Platforms compete with each other for both delivery and takeout orders. For an order to occur, a Restaurant Platform needs to match a consumer and a restaurant.  As a result, in competing for orders, Restaurant Platforms compete with each other for both consumers and restaurants.

53.     Restaurant Platforms exhibit indirect network effects, in that the value that they offer to one side of the platform is a function of the extent of the use of the other side of the platform.  A Restaurant Platform that more consumers use is more valuable to restaurants, because the platform connects those restaurants with more consumers.  Conversely, a Restaurant Platform that more restaurants use is more valuable to consumers, because that platform connects those consumers to more restaurants.

54.     These indirect network effects thus create a positive feedback loop for a market-leading Restaurant Platform.  A Restaurant Platform that is popular with consumers is more

attractive to restaurants and will therefore succeed in attracting more restaurants to the platform. Once more restaurants agree to use the platform, the platform becomes even more attractive to new consumers, who will also use that platform.

55.     In producing significant benefits to a market-leading Restaurant Platform, however, this positive feedback loop imposes significant barriers for smaller firms and new entrants.  A small or new entrant cannot reasonably compete with larger Restaurant Platforms unless it can offer consumers a sufficient number of restaurants from which to choose.  Conversely, the small or new entrant cannot realistically attract restaurants unless it can provide those restaurants with access to a sufficient number of consumers.  Indirect network effects thus simultaneously make it easier for a market-leading firm to maintain its dominance and more difficult for a new entrant or smaller firm to establish a foothold.

56.     Even Amazon, for example, was unable successfully to break into the Restaurant Platform Market.  As the *New York Times* explained:  "Since it started in Seattle in 2015, Amazon Restaurants has struggled to gain a foothold in the restaurant delivery market," where "nearly 80 percent" of the market is controlled by "UberEats, Grubhub and DoorDash."  Accordingly, in June 2019, Amazon Restaurants shut down.

57.     Indirect network effects alone, however, do not necessarily preclude new entrants or smaller firms from taking market share away from a market-leading firm.  For example, one journalist explained that DoorDash was able to take market share away from Grubhub by expanding the services that it offered.

> Grubhub's original model was a marketplace for consumers to order food from independent restaurants that already had their own delivery fleets.  Though this was a game-changer for consumers, it constrained supply to only listing restaurants that could perform their own deliveries.  This was a mistake.

12

> Postmates and DoorDash were the first to realize that if they could provide the broader group of restaurants that did *not* do delivery with the ability to do deliveries, they could dramatically increase the number of restaurants that could exist in the marketplace, thereby leapfrogging Grubhub's selection (and liquidity).
>
> Once they realized this Achilles heel, Postmates and DoorDash raced to exploit the vulnerability with a growth-at-all costs mentality. Grubhub was caught backfooted. Grubhub thought that they had saturated the market, but they had only saturated a subsection of the market—independent restaurants that made their own deliveries. Meanwhile, DoorDash, Postmates, Uber Eats, and all other food delivery startups were racing to capitalize on the newer, bigger definition of the category.

58. In addition to increasing the size of the market, Restaurant Platforms have also sought to gain and protect their market shares in a number of other ways.

59. On the restaurant side, Restaurant Platforms have sought to prevent competitors from signing up additional restaurants by entering into exclusive agreements with those restaurants. For example, Grubhub has an exclusive deal with Yum Brands, DoorDash has an exclusive deal with Chili's and the Cheesecake Factory, and Uber used to have an exclusive deal with McDonald's.

60. On the consumer side, Restaurant Platforms have sought to discourage consumers from using more than one Restaurant Platform, or "multihoming," by offering what are essentially volume discounts.

61. Restaurant Platforms could also compete by offering consumers and restaurants better technology or better service, by offering restaurants lower Restaurant Commission Rates, and by offering consumers lower Consumer Commission Rates. Defendants' conduct, however, including their MFNs, has limited such forms of competition.

**f.   Competition in the Takeout and Delivery Market**

62.     The restaurant industry is notoriously competitive and dynamic.  In 2018, there were approximately 650,000 restaurants in the United States, with about 60,000 opening and 50,000 closing every year.  As this turnover indicates, the profit margins of restaurants are typically thin.  According to Upserve, a company that provides restaurant-management software, restaurant profit margins generally range from 0% to 15%.  Because of these thin profit margins, restaurants generally need a significant number of sales to cover their fixed costs.

63.     Restaurants generate revenue by selling through both the Takeout and Delivery Market and the Sit-Down Market.   Over the past several years, an increasing number of restaurants' takeout and delivery sales have been placed through Restaurant Platforms.  Analysis from Cowen indicates that the share of delivery orders placed online increased from approximately 26% in 2012 to 46% in 2017, with the prediction that they would rise to 73% by 2022.  Morgan Stanley's research indicates that much of this growth occurred, and will continue to occur, on Restaurant Platforms:   the proportion of online delivery orders through Restaurant Platforms increased from 41% in 2015 to 68% in 2018.  Morgan Stanley projects that this number will increase to 87% by 2025.

64.     These market conditions mean that restaurants must work with Defendants, which each have a significant share of the fast-growing Restaurant Platform Market, to generate sufficient sales to turn a profit.  As one restaurant owner has explained:  "These delivery companies were never something I wanted to work with, but we have to. . . .  We are a fast-casual restaurant.  We are dependent upon volume to make any money."  Another restaurant owner explained to *Forbes*:  "These platforms are growing exponentially and have developed a primary relationship with

customers.  They are not providing a service; they are growing a network.  If you 'own' the customer, you can charge whatever you want, which is what they are doing."

65.     These are not mere anecdotes.  The *New York Times* has explained that Restaurant Platforms are so popular with consumers that "few restaurants can afford to opt out."  *Buzzfeed News* has explained that restaurants "have no choice to use them if they want to retain customers." *Food & Wine* has concluded:  "Most restaurant owners don't feel like they have a choice but to work with these platforms to survive."

66.     Accordingly, the best estimate is that the vast majority of the 650,000 restaurants in the United States sell through Restaurant Platforms.  Analysis from *Money Under 30* indicates that 300,000 of these restaurants sell through Grubhub and 600,000 sell through Postmates, and that over 300,000 restaurants worldwide sell through Uber.  Data from *Reuters* indicates that over 100,000 restaurants sell through Uber in the United States and Canada, and confirms that 300,000 restaurants in the United States sell through Grubhub.

67.     Analysis from *Thinknum* shows that, in some markets, Restaurant Platforms have a stranglehold on restaurants.  In New York City, nearly 60% of restaurants sell through Grubhub; in Chicago, approximately 85% of all restaurants sell through Grubhub; and in Las Vegas and San Francisco, nearly *all* restaurants do so:

| City | Total Restaurants | Restaurants on Grubhub | Restaurants on Uber |
|------|------------------|------------------------|---------------------|
| New York | 26,697 | 15,074 | 3,056 |
| Los Angeles | 29,560 | 7,531 | 2,216 |
| Chicago | 8,675 | 7,319 | 2,323 |
| Houston | 10,000 | 4,803 | n/a |
| Las Vegas | 4,364 | 4,246 | n/a |

| | | | |
|---|---|---|---|
| San Diego | 7,000 | 4,161 | n/a |
| San Francisco | 4,015 | 3,935 | n/a |
| Philadelphia | 6,000 | 3,913 | n/a |
| Miami | 4,995 | 3,726 | n/a |

Although data for Uber is more limited than data for Grubhub, it is reasonable to infer that more restaurants use Uber in markets where Uber's sales exceed Grubhub's, such as Miami and Houston.  As a result, it is likely that more than 75% of restaurants in Miami and more than 48% of restaurants in Houston use Uber.  These estimates for Uber use in New York, moreover, do not appear to include restaurants outside Manhattan.

68.     Data for Postmates is not publicly available, but the analysis from *Money Under 30* indicates that even more restaurants use Postmates than Grubhub or Uber.  This conclusion is even stronger in markets where more restaurants use Postmates than Grubhub.

69.     In any event, it is reasonable to infer that in Los Angeles, a market where Postmates outsells Grubhub two-to-one, more restaurants use Postmates than Grubhub.  The same is true with respect to Miami, where Postmates' sales also exceed Grubhub's.  As a result, it is likely that substantially more than 25% of restaurants in Los Angeles and more than 75% of restaurants in Miami use Postmates.

70.     With respect to restaurants that offer delivery (a subset of all restaurants), the percentage that sell through Restaurant Platforms is even higher.  According to a survey from *Restaurant Owner*, for example, in 2019 almost 80% of independent restaurants that offered delivery did so through a Restaurant Platform.

71.     The market conditions are such that even restaurants that do not agree to work with Restaurant Platforms are forced to deal with them, in that Restaurant Platforms have added some restaurants to their platforms without their consent.  One restaurant owner described her experience with Grubhub as follows:

> "If we don't sign up for this 'partnership' you pirate our menus off our website and take orders from customers anyway," continues Wade in the letter.  "The pre-charged payment cards sometimes don't work and everything we made languishes, unpaid for.  We field angry calls from customers who think it's our fault they didn't get the food they ordered.  When my manager called customer service to tell you how unfair it is that we are paying for your mistakes, he was told 'Well, none of this would happen if you would just sign up with us.'  Which sounds a lot like what the mob boss says after they burn down your house."

72.     In addition to having to work with them, restaurants are also forced to *compete* with these Restaurant Platforms in the Takeout and Delivery Market.  As Grubhub observes, its competitors include "the traditional offline ordering process used by the vast majority of restaurants" and "online competition" from "national and local service providers, point-of-sale module vendors that serve some independent restaurants who have their own standalone websites and the online interfaces of Enterprise restaurants that also offer takeout."

73.     Grubhub's conduct further confirms that it competes with restaurants for orders. Grubhub has created "shadow" websites for restaurants that consumers can use to place orders. These shadow websites, which may appear to be restaurants' actual websites, are designed to divert what would otherwise be direct orders from restaurants to Grubhub.  Uber likewise has stated (in its 2019 10-K) that its competitors include both other Restaurant Platforms and restaurants.

74.     Unsurprisingly, sales through Restaurant Platforms have cannibalized restaurants' direct sales.  For example, a New York City Hospitality Alliance survey indicates that, for 2 out

of 3 restaurants, customers who previously ordered directly now order through Grubhub.  As *The New Yorker* has explained:

> Companies like GrubHub maintain that the revenue they bring restaurants is "incremental"—the cherry on top, so to speak, of whatever sales the place would have done on its own.  They also argue that delivery orders are a form of marketing, exposing potential new customers who might convert to lucrative in-restaurant patrons.  The problem is that as consumers use services like Uber Eats and Seamless for a greater share of their meals, delivery orders are beginning to replace some restaurants' core business instead of complementing it. . . .  And, as delivery orders replace profitable takeout or sit-down sales with less profitable ones—ostensibly giving restaurants business but effectively taking it away—the "incremental" argument no longer holds.  "It's total bullshit, and you can quote me on that," Justin Rosenberg, the C.E.O. of the Philadelphia-based fast-causal chain Honeygrow, told me.  "I've spoken to C.F.O.s of bigger fast-casuals, and they've said the same thing."

In other words, orders that used to flow to restaurants directly, for which restaurants did not have to pay any commissions to Restaurant Platforms, now flow to the Restaurant Platforms.

### g.  Competition in the Sit-Down Market

75.     In addition to competing for orders in the Takeout and Delivery Market, restaurants also compete for sales in the Sit-Down Market.  Based on data from *Restaurant Owner*, approximately 60% of restaurants offer delivery (either themselves or through a Restaurant Platform) and thus compete in both markets.

76.     Sales in the Sit-Down Market are more profitable to restaurants than sales in the Takeout and Delivery Market.  As Thanx, a company specializing in customer engagement, has concisely stated, "Delivery profit margins aren't as high as dine-in margins."  This is because "[c]ustomers usually skip drinks when ordering in, which automatically cuts profits.  Plus, labor, packaging, and delivery fees are all higher, which eats into the profits."  *CNN* has likewise explained that consumers are "less likely to ask for menu items that carry higher margins—

including soda and alcoholic drinks—when they order in, cutting deeper into profit from delivery." And the *Wall Street Journal* has noted that "[d]elivery and packaging fees take a big cut of restaurant profits, and deliveries often don't include beverages, which provide high margins."

77.     Sales in the Sit-Down Market are thus essential for a restaurant's survival, but Restaurant Platforms have jeopardized those sales.  Restaurant Platforms do not compete in the Sit-Down Market, but they have nevertheless cannibalized sales in that market.  Research from Morgan Stanley indicates that, in 2017, "43% of consumers who ordered food for delivery say it replaced a meal at a restaurant."  And according to the NPD Group, since 2014, "total visits to restaurants have declined more than 700 million visits."

78.     Restaurant owners tell a similar story.  The *New York Times* provides an example:

> The major delivery companies have long argued that apps expose restaurants to new customers, allowing small businesses to tap into a network of tens of millions of online users and to benefit from the advertising muscle of multibillion-dollar companies.  Katie Norris, a Grubhub spokeswoman, said the service drove "incremental sales"—bringing in customers who would otherwise stay home and cook.
>
> "The incremental sales and traffic with higher average checks more than offset commission rates," she said.
>
> But that has not been the experience of Anil Bathwal, who runs the Kati Roll Company, a New York-based chain specializing in Indian street food.
>
> Mr. Bathwal did not have a large-scale delivery operation when his chain signed up with Seamless, and he said the service had initially brought him new business.  But over the years, third-party delivery has grown to account for as much as 30 percent of his sales, as existing customers—*those who used to eat at the restaurant*—have started using Seamless instead.
>
> "As time goes by, more and more of my existing customers are being cannibalized," said Mr. Bathwal, who estimates the delivery service has reduced his overall profits by 2 to 5 percent.

Considering this juxtaposition between Restaurant Platforms' promises to restaurants of more orders and the reality that the platforms cannibalize restaurants' sit-down business, one New York City councilman has characterized Restaurant Platforms as a "trojan horse" for restaurants.

### h. Geographic Markets

79.     The relevant geographic markets regarding Defendants' conduct are both the nationwide market (the "National Market") and the local markets described below, because Restaurant Platforms compete in the Restaurant Platform Market and the Takeout and Delivery Market throughout the United States, at both the national and local level.  Defendants' conduct also affects and is directed at restaurants in the Sit-Down Market in these geographic markets.

80.     Restaurant Platforms advertise their services nationwide; operate nationwide; charge restaurants the same Restaurant Commission Rates nationwide; charge the same Consumer Commission Rates nationwide; provide the same services nationwide; and impose the same contractual restrictions—including, with respect to Defendants, the same MFNs—on restaurants and consumers nationwide.

81.     Restaurant Platforms compete with national restaurant chains in the Takeout and Delivery Market.  They also compete with each other nationally in the Restaurant Platform Market and the Takeout and Delivery Market, to build a national network of consumers to offer restaurants, and a national network of restaurants to offer consumers.  Grubhub asserted in its most recent 10-K, for example, that its acquisition of Eat24 "expanded the breadth and depth of [its] *national* network of restaurant partners and active diners."

82.     Restaurant Platforms also compete locally in the Restaurant Platform Market and the Takeout and Delivery Market.  In particular, Restaurant Platforms compete with each other and restaurants for delivery and takeout orders from consumers.  Such competition is local because

a consumer in one city is highly unlikely to order food through a Restaurant Platform from a restaurant in a far-away city.  To take an obvious example, for a consumer located in New York City, a takeout order from a restaurant in San Francisco is not a reasonable substitute for a takeout order from a restaurant in New York City.

83.     Although Restaurant Platforms thus compete with each other and restaurants in a nationwide market, the local markets in which they also compete (the "Local Markets") include New York City, Los Angeles, Chicago, Dallas-Fort Worth, Houston, Washington, Miami, Philadelphia, Atlanta, Boston, Phoenix, and San Francisco.

### i.  Defendants' Market Power

84.     <u>Defendants' High Market Shares</u>.  Defendants' high market shares evidence their market power in the Restaurant Platform Market.  Grubhub's market share is 31% nationwide and 67% in New York City.  Uber's market share is at least 20% nationwide and much higher in some markets, such as Miami, where its market share is at least 55%.  Postmates' market share in Los Angeles, the second-largest city in the United States, is 37%.

85.     <u>Defendants' Network of Restaurants</u>.  With respect to the Takeout and Delivery Market and the Sit-Down Market, Defendants' market power is demonstrated by the sheer number of restaurants that have no choice but to sell through Defendants' platforms.  Nearly half of all restaurants in the United States sell through Grubhub, and a much larger share of restaurants that offer delivery do so through Grubhub.  Similarly, more than 15% of restaurants in the United States—including restaurants that do not even offer delivery—sell through Uber.  The data suggest that even more restaurants sell through Postmates than through Grubhub or Uber.

86.     The numbers are even more striking in certain large Local Markets, such as New York City (nearly 60% of all restaurants sell through Grubhub), Chicago (approximately 85% of

all restaurants sell through Grubhub), Philadelphia (approximately 65% of all restaurants sell through Grubhub), Miami (more than 75% of all restaurants sell through Uber), Houston (more than 48% of restaurants sell through Uber), and Los Angeles (substantially more than 25% of all restaurants sell through Postmates).

87.     Defendants' Supracompetitive Pricing for Restaurants.   Defendants' ability to charge supracompetitive prices to restaurants without losing them as customers and without losing out on profit further demonstrates their market power in the relevant markets.

88.     Defendants charge a Restaurant Commission Rate between 15% and 30%, depending on the service being offered (*e.g.*, takeout, delivery orders that the restaurant delivers, or delivery orders that the platform delivers).  When Defendants provide delivery, they typically charge 30% Restaurant Commission Rates.  Uber charges restaurants 15% Restaurant Commission Rates even for customers who order only for pickup.   Similarly, Grubhub's own advertising material indicates that restaurants that rely on Grubhub for delivery can expect to pay more than 33% Restaurant Commission Rates.  And even in the face of legislation that prohibits Restaurant Platforms from charging Restaurant Commission Rates exceeding 15% during the COVID-19 pandemic, Postmates has reportedly "continue[d] to charge restaurants between 20 and 33 percent of each order."

89.     Defendants were not always able to charge such high prices.  Instead, as Restaurant Platforms have become more essential to restaurants' very survival, and as their share of the Takeout and Delivery Market has increased, Restaurant Platforms have substantially increased their prices.

90.     Restaurant Platforms initially charged Restaurant Commission Rates between 10% and 12%.  When it started in 2004, for example, Grubhub charged a 10% Restaurant Commission

Rate.  By 2015, Restaurant Platforms were "reportedly" charging Restaurant Commission Rates "as large as 18%."  By that point, as noted, over 40% of online delivery orders were being placed through Restaurant Platforms.  The following year, 2016, Grubhub charged between 12% and 24%, still significantly less than the current rate, but also much more than its initial 10% rate.

91.     With 80% of online delivery orders now placed through Restaurant Platforms, however, Defendants' Restaurant Commission Rates today are approximately 30%, or triple what they were initially.  Basic principles of economics suggest that a firm that triples its price should *lose* revenue as consumers flock to lower-price competitors.  But Defendants' price increases have *not* resulted in Defendants losing market share or losing profit.

92.     Over the period from 2016 to 2019, Grubhub's revenue increased from approximately $500 million to over $1.3 billion.  Uber's revenue from its Uber Eats brand more than quadrupled between 2017 and 2019.

93.     Defendants have been able to substantially raise prices without losing customers or profit because, as explained above, market conditions compel restaurants to work with them.  Although they evidently have chosen to work with Grubhub, for example, over 90% of restaurants believe that Grubhub's fees are "unreasonable."

94.     <u>Defendants' Supracompetitive Pricing for Consumers</u>.  Defendants' ability to charge supracompetitive prices to consumers further demonstrates their market power.  The *New York Times* has found, for example, that the markup for delivery orders through Defendants' Restaurant Platforms ranged from between 25% to 91%.  The author aptly characterized these prices as "downright egregious."

95.     Defendants' MFNs.  Defendants' ability to impose their MFNs on restaurants also demonstrates their market power.  These provisions, as explained just below, harm restaurants by limiting their ability to compete with Defendants.

96.     Defendants' Ability to Control Prices.  Combined with the significant number of restaurants that are forced to accept Defendants' MFNs and the supracompetitive Restaurant Commission Rates that Defendants charge, these MFNs enable Defendants to control, or at minimum substantially affect, the prices charged by restaurants in the Takeout and Delivery Market and the Sit-Down Market.

### j.   Anticompetitive Purpose and Effects of Defendants' MFNs

#### i.   *Grubhub and Uber's MFNs Prevent Restaurant Platforms from Competing on Price and Insulate Them from Competition*

97.     Grubhub and Uber's MFNs limit price competition in the Restaurant Platform Market by fixing a key (and, in some cases, the only) component of the end-price paid by consumers for goods ordered through Restaurant Platforms, and by removing a powerful incentive for Restaurant Platforms to reduce Restaurant Commission Rates.

98.     Grubhub and Uber's MFNs, as explained above, prohibit restaurants from listing their menu items on competing platforms for a lower price.  This restriction is not trivial, "especially since many restaurants feel the need to list on more than one app."  Grubhub thus recently touted that it offers "menu price parity with any other online ordering option."

99.     Given that Restaurant Platforms exhibit indirect network effects, as also explained above, Restaurant Platforms must attract a sufficient number of consumers and restaurants in order to survive.  Ordinarily, like any platform, a Restaurant Platform could attract consumers by offering them lower prices—that is, lower Restaurant List Prices.  Likewise, ordinarily, a

Restaurant Platform could attract restaurants by offering them lower prices—that is, lower Restaurant Commission Rates.

100.    Absent Grubhub and Uber's MFNs, a competing Restaurant Platform could thus attract consumers by offering restaurants lower Restaurant Commission Rates to induce those restaurants to provide lower Restaurant List Prices.  For example, a restaurant may be willing to offer a lower Restaurant List Price to a Restaurant Platform that charges a 15% Restaurant Commission Rate, instead of a 30% Restaurant Commission Rate (like Defendants).

101.    If successful, this pricing strategy would make the competing platform more attractive to consumers because it would provide them with lower Restaurant List Prices, which are a key component of the end-price that they pay for delivery and takeout orders.  In fact, for orders for which Restaurant Platforms do not charge delivery fees or commissions to consumers, Restaurant List Prices *are* the end-prices that consumers pay.  Accordingly, reducing that price would draw more consumers to the platform.

102.    This pricing strategy would make the platform more attractive to restaurants as well, because it would provide them with lower Restaurant Commission Rates.  All else equal, a restaurant would prefer to sell on a Restaurant Platform that charges a 15% Restaurant Commission Rate as opposed to a Restaurant Platform that (like Defendants) charges a 30% Restaurant Commission Rate.

103.    Grubhub and Uber's MFNs, however, eliminate even the possibility of a competing platform engaging in this strategy.  Because these MFNs prohibit restaurants from providing competing platforms with lower Restaurant List Prices, competing platforms have no incentive to offer restaurants lower Restaurant Commission Rates to induce those restaurants to lower their Restaurant List Prices.  Grubhub and Uber's MFNs thus discourage competing platforms from

reducing their Restaurant Commission Rates.  For this reason, Restaurant Commission Rates are essentially uniform (30%) among the largest Restaurant Platforms.

104.    At the same time, Grubhub and Uber's MFNs create an incentive for Grubhub and Uber to continually increase their Restaurant Commission Rates, as they have over the past fifteen years.  By increasing their Restaurant Commission Rates, Grubhub and Uber can increase their revenue without any concern that consumers will flee to a competing platform with lower Restaurant List Prices.

105.    The most fundamental and anticompetitive feature of Grubhub and Uber's MFNs is that they prevent a restaurant from choosing—for *any reason*—to charge a lower Restaurant List Price on a competing platform.  As a result, Grubhub and Uber's MFNs flatly eliminate competition among Restaurant Platforms on Restaurant List Prices, thereby preventing competing platforms from offering lower Restaurant List Prices to consumers.  For many consumers, as noted, Restaurant List Prices are the end-prices consumers pay.  Grubhub and Uber's MFNs thus effectively fix the end-price that consumers pay when they order through Restaurant Platforms.

106.    Grubhub and Uber's MFNs thus serve to insulate Defendants from competition on *both* sides of the market, by fixing the Restaurant List Price, which is a key component of the price paid by consumers, and by discouraging competing Restaurant Platforms from offering lower Restaurant Commission Rates.  This insulation has enabled Grubhub and Uber to hike up Restaurant Commission Rates, forcing consumers and restaurants alike to pay higher prices, without fear of being undercut by competing Restaurant Platforms.  Without the ability to offer lower Restaurant List Prices, competing platforms are blocked from creating the positive feedback loop needed to survive in the Restaurant Platform Market because they lose the primary (and to many consumers, only) means of attracting consumers to their platform and as a result are unable

to attract more restaurants.  Anyone with an understanding of the market is unlikely to even attempt to enter.

107.    This is an intended and predictable consequence of Grubhub and Uber's MFNs.  As the *Yale Law Journal* has reported:  "The leading theoretical analysis by economists Andre Boik and Kenneth Corts finds that platform MFNs lead to higher platform fees, drive up retail prices, and discourage entry by firms with lower cost business models."

108.    In addition to enabling Grubhub and Uber to increase Restaurant Commission Rates, this insulation resulting from Grubhub and Uber's MFNs has also stalled technological development in the Restaurant Platform Market.  *Tech Crunch* has reported, for example, that "the primary differentiation between delivery apps today is not based on innovations that meaningfully impact user experience."  The *Tribeca Citizen*, in an article titled "Why Restaurants Hate GrubHub Seamless," characterized the state of technology in the Restaurant Platform Market as follows: "The technology stinks."  By 2016, Grubhub "still [hadn't] found a way to integrate their current technology into restaurant point-of-sale systems—or even a single tablet."

109.    Similarly, Grubhub and Uber offer abysmal service to restaurants.  As the *Washington Post* recently explained:  "Virtually every restaurant person has a nightmare story about the apps botching their menus and hours of operations."  One survey indicated that less than 10% of responding restaurants had "a positive experience with Grubhub/Seamless."

110.    Grubhub and Uber perform no better for consumers.  According to SiteJabber, a website that allows consumers to rate businesses, Grubhub "ranks 95th among Food Delivery sites," with an average "rating of 1.18 stars from 2,666 reviews."  Uber is only slightly better—it "ranks 73rd among Food Delivery sites," with an average "rating of 1.76 starts from 21 reviews." These overwhelmingly negative reviews are hardly shocking in light of recent survey results that

show that *more than 25%* of delivery drivers for Restaurant Platforms have sampled customers' food before delivering it.

### ii. Defendants' MFNs Preclude Restaurants from Competing on Price with Defendants in the Takeout and Delivery Market

111.    While only Grubhub and Uber restrict price competition across Restaurant Platforms, all of Defendants' MFNs have both the purpose and effect of precluding restaurants from competing directly on price with Defendants in the Takeout and Delivery Market.

112.    Defendants' MFNs prohibit restaurants from selling menu items at a lower price to consumers who order directly from restaurants, regardless of whether those orders are for takeout, delivery, or sit-down, and regardless of whether those orders are made online, in person, or over the phone.  Under these MFNs, for example, a restaurant that lists an item on Defendants' platform for $10 is contractually prohibited from selling that item for $9 to a consumer who calls the restaurant to order that item for takeout.

113.    It is easy to see why a restaurant would want to charge consumers who order directly from the restaurant lower prices than consumers who order through Defendants' platforms. After all, whenever a restaurant sells an item through Defendants' platforms, that restaurant must pay Defendants a hefty Restaurant Commission Rate.  In fact, Defendants' Restaurant Commission Rates often *exceed* restaurants' profit margins.  As a result, restaurants cannot make any money selling through Defendants' platforms unless restaurants increase the prices of their menu items.

114.    With respect to Uber and its 30% Restaurant Commission Rate, for instance, *Forbes* has explained as follows:

> The problem here is that the average profit margin for a restaurant is under 30%.  Fast food such as McDonalds reported profit margins about 22% in 2017.  Casual dining or family style restaurants have a profit margin between 5% to 10%.  Lastly, full-service restaurants such as fine-dining have average profit margins of about 6.1%.

> Based on the average profit margins above, every restaurant that
> engages Uber Eats will lose money on every order they take.  The
> more orders coming from Uber Eats, the more money a restaurant
> would lose.

115.    The natural and predictable result of Defendants' MFNs is that restaurants must increase their prices when they sell on Defendants' platforms.  For example, the New York City Hospitality Alliance found that, in 2019, 64.1% of restaurants either raised menu prices or considered raising menu prices to offset fees from Grubhub.  *Restaurant Business* says:

> When the Habit Burger Grill began offering delivery to its
> customers last year, the company did something a bit different.
>
> It upcharged delivery orders by 25%.
>
> "At the end of the day, with the commission structures the way they
> are, someone has to pay for that convenience," CEO Russ Bendel
> said on an upcoming episode of *Restaurant Business'* podcast, "A
> Deeper Dive."
>
> It's an increasingly common strategy.  Chains, eager to jump on
> board to an increasingly popular service but worried about the
> impact such fees can have on their business, have started charging
> delivery customers higher prices.

*Tech Crunch* interviews with restaurant owners likewise indicate that many restaurants "increase on-app list prices when selling through delivery apps as a way of offsetting the up to 30% fee the delivery apps charge."

116.    This strategy of increasing "on-app list prices when selling through delivery apps" is unavoidable for any restaurant with profit margins below Defendants' Restaurant Commission Rates.  For example, a restaurant with a 10% profit margin can ordinarily make $2 whenever it sells $20 in food.  But if the restaurant is also forced to pay a 30% Restaurant Commission Rate on top of its existing costs, then the restaurant would *lose* $4 whenever it sold the same items for

$20.  Just to break even, the restaurant would need to increase its prices from $20 to $26.  To make the same $2, the restaurant would have to increase its prices from $20 to $29.

117.    Defendants' Restaurant Commission Rates thus force restaurants to increase the prices of items listed on Defendants' platforms.  Compounding the anticompetitive effect, Defendants' MFNs force restaurants to charge consumers who buy directly from restaurants, or through a competing Restaurant Platform, *those same inflated prices*.

118.    In sum, coupled with their exorbitant Restaurant Commission Rates, Defendants' MFNs prevent restaurants from charging consumers who buy directly from restaurants (or through competing Restaurant Platforms) lower prices, *even though* restaurants *would* charge lower prices to consumers who buy directly from restaurants (or through competing Restaurant Platforms) but for Defendants' MFNs.  In short, the MFNs force consumers to pay higher prices.

119.    The impact of Defendants' MFNs in the Takeout and Delivery Market is not limited to increased prices for consumers.  These MFNs, as noted, have insulated Defendants from competition and enabled them to increase their Restaurant Commission Rates with impunity.  These rates are so high that they are driving many restaurants out of business, thereby reducing consumer choice.  As the *New York Times* has reported:

> For Paul Geffner, the growing popularity of food-delivery apps has hurt.  He has run Escape from New York Pizza, a small restaurant chain in the Bay Area, for three decades, relying on delivery orders as a major source of revenue.
>
> After he offered delivery through the apps in 2016, his business teetered.  Two of his five pizzerias, which together had generated annual profits of $50,000 to $100,000, lost as much as $40,000 a year as customers who had ordered directly from Escape From New York switched to the apps.  That forced Mr. Geffner to pay the commissions.

"We saw a direct correlation between the delivery services and the reduction of our income," Mr. Geffner said.  "It was like death by a thousand cuts."

*NPR* provides a similar example:  "With already thin profit margins further diluted by the app fees, Bathwal could not justify keeping his six locations open.  He temporarily shuttered all of his restaurants with hopes of reopening, when he can, on a pared-down menu emphasizing items that are the most affordable to make."

### iii.   Defendants Use Their MFNs to Control Prices in the Takeout and Delivery Market and Sit-Down Market

120.   According to the publicly available data, as noted, the vast majority of restaurants in the United States sell their products through Defendants' platforms.  Almost half of these restaurants sell through Grubhub nationwide, and in many cities—including New York, Chicago, Las Vegas, San Diego, San Francisco, Philadelphia, and Miami—more than half sell through Grubhub.  The more limited data available for Uber indicates that approximately 30% of restaurants in Chicago, more than 48% of restaurants in Houston, and approximately 75% of restaurants in Miami sell through Uber.  At least 25% of restaurants in Los Angeles, as a further example, sell through Postmates.  And all of these percentages are significantly higher with respect to restaurants in the Takeout and Delivery Market.

121.   In short, in both the National Market and the Local Markets, a large proportion of restaurants sell through Defendants' platforms and are therefore bound by Defendants' MFNs. These MFNs essentially require that restaurants increase the prices that they charge to consumers who buy directly from those restaurants, regardless of whether those consumers order for delivery, takeout, or sit-down.  In addition, the *amount* by which those restaurants must increase their prices is driven by Defendants, who set the Restaurant Commission Rates.  Defendants' MFNs thus do not merely increase the prices that a handful of restaurants charge to consumers in the Takeout and

Delivery Market and in the Sit-Down Market.  Instead, in tandem with the Restaurant Commission

Rates, those provisions both drive and substantially affect the prices in the Takeout and Delivery

Market and the Sit-Down Market.  The fact that Defendants are able to achieve such results

demonstrates that Defendants possess the ability to control prices in both the Takeout and Delivery

Market and the Sit-Down Market.

### iv.   The Substantial Anticompetitive Costs of Defendants' MFNs Outweigh Any Procompetitive Benefits

122.    The anticompetitive costs of Defendants' conduct, as shown, are substantial.  As a

direct result of Defendants' conduct, consumers are forced to pay supracompetitive prices for

goods from any restaurant that must use Defendants' platforms; consumers and restaurants must

use Restaurant Platforms that offer inferior technology and service; and consumers are left with

fewer restaurants from which to choose.

123.    Consistent with empirical research from economists regarding MFNs generally,

Defendants' MFNs harm consumers and competition.  Consumer prices fell, as just one example,

when European countries banned online travel agencies from using MFNs.

124.    These substantial anticompetitive costs outweigh any procompetitive justification

Defendants may claim.  Defendants' MFNs, for example, do not protect Defendants from free-

riding.  With very few exceptions, consumers who use Defendants' platforms do so because the

platforms are convenient, not to find restaurants and then order directly from those restaurants.

The notion that such consumers would be willing to spend more time than necessary to place an

order for takeout or delivery is unreasonable and unsupported.

125.    Similarly, these MFNs could not protect Defendants from free-riding with respect

to restaurants that rely on Defendants to provide delivery.  A consumer cannot order from such

restaurants directly for delivery.  Accordingly, there is no risk that a consumer would use Defendants' platforms to find that restaurant and then order from that restaurant directly.

126.    Just as fundamental, no rationale concerning free-riding could explain why Grubhub and Uber's MFNs prohibit restaurants from offering lower Restaurant List Prices on competing Restaurant Platforms.  Indeed, DoorDash's ability to compete with Defendants without such MFNs is proof that such restrictions are not necessary for Restaurant Platforms to offer consumers the benefits of their platform.

127.    In prohibiting restaurants from charging lower prices to consumers who purchase directly from restaurants in the Sit-Down Market, moreover, Defendants' MFNs control prices in a market in which Defendants do not even participate.  There can be no procompetitive justification for this type of restraint.

## CLASS INJURY AND STANDING

128.    Plaintiffs and the Class have suffered injury of the type the antitrust laws were intended to prevent and flows from that which makes Defendants' act unlawful.

129.    Plaintiffs and the Class allege that Defendants' anticompetitive conduct has caused them to pay supracompetitive prices.  Such an injury is plainly of the type the antitrust laws were intended to prevent.

130.    Defendants' misconduct has directly caused this injury to Plaintiffs and the Class. Plaintiffs and the Class are naturally motivated to enforce the antitrust laws because they had and have the natural economic self-interest in paying reasonable rather than supracompetitive prices.

## V.     CLASS ALLEGATIONS

131.    Plaintiffs bring this action on behalf of themselves and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of three classes, several of which may comprise subclasses, to be defined based on discovery.

132.    The first class comprises all persons or entities in the United States who have purchased goods, through a Restaurant Platform, from a restaurant subject to Grubhub's or Uber's MFNs (the "Restaurant Platform Class").

133.    This first class, for some claims, concerns local markets in which the applicable Defendant's market share of the Restaurant Platform Market is approximately 30% or higher (the "Monopolized Restaurant Platform Local Markets Class").  The Monopolized Restaurant Platform Local Markets include, but are not limited to, New York City, Boston, Chicago, and Philadelphia for Grubhub; and Miami, Houston, Dallas, Washington, D.C., and Atlanta for Uber.

134.    The first class excludes any person or entity whose purchases through a Restaurant Platform were solely from restaurants that sold exclusively through that Restaurant Platform.

135.    The second class comprises all persons or entities in the United States who have purchased goods, for takeout from or delivery by the restaurant, directly from a restaurant subject to any Defendant's MFNs (the "Takeout and Delivery Class").

136.    This second class, for some claims, concerns local markets in which the applicable Defendant's market share of the Takeout and Delivery Market is approximately 30% or higher (the "Monopolized Takeout and Delivery Local Markets Class").  The Monopolized Takeout and Delivery Local Markets include, but are not limited to, New York, Chicago, and Philadelphia for Grubhub; Miami and Houston for Uber; and Los Angeles for Postmates.

137.    The third class comprises all persons or entities in the United States who have purchased goods, for sit-down dining in the restaurant, from a restaurant subject to any Defendant's MFNs (the "Sit-Down Class").  This third class, for some claims, concerns the local markets described in the preceding paragraph (the "Sit-Down Local Market Class").

138.    All foregoing classes exclude (i) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates and (ii) the Judge, his or her law clerks, spouse, and any person within the third degree of relationship living in the Judge's household and the spouse of such a person.

139.    Plaintiffs reserve the right to amend any of these class definitions if further investigation, discovery, or both indicate that such definitions should be narrowed, expanded, or otherwise modified.

140.    The members of each class are so numerous that joinder of all members is impracticable.  The precise number of members of each class is unknown to Plaintiffs at this time, but it is believed to be in the hundreds of thousands.

141.    Defendants have acted on grounds that apply generally to the members of each class, so that final injunctive relief is appropriate respecting each class as a whole.

142.    Common questions of law and fact exist as to all members of each class and predominate over any questions solely affecting individual members of each class.  Such common issues include:

    (a) Whether each Defendant has market power in the Restaurant Platform Market, the Takeout and Delivery Market, and the Sit-Down Market;

    (b) Whether each Defendant has monopoly power in the Restaurant Platform Market and the Takeout and Delivery Market, including in local markets;

(c) Whether each Defendant's MFN produces substantial anticompetitive effects, without procompetitive justification, in the Restaurant Platform Market, the Takeout and Delivery Market, and the Sit-Down Market;

(d) Whether any procompetitive efficiencies from each Defendant's MFN could be achieved through less anticompetitive means;

(e) Whether each Defendant willfully acquired or maintained their monopoly power in the Monopolized Restaurant Platform Local Markets and the Monopolized Takeout and Delivery Local Markets;

(f) Whether each Defendant implemented or maintained their MFN with the specific intent to monopolize the Monopolized Restaurant Platform Local Markets and the Monopolized Takeout and Delivery Local Markets;

(g) Whether each Defendant had a dangerous probability of achieving monopoly power in the Monopolized Restaurant Platform Local Markets and the Monopolized Takeout and Delivery Local Markets; and

(h) Whether, and to what extent, each Defendant's MFN caused Plaintiffs to suffer antitrust injury.

143.    Plaintiffs' claims are typical of the claims of the other members of each class they seek to represent.  Defendants' practices have targeted and affected all members of each class in a similar manner, *i.e.*, they have all sustained damages arising out of Defendants' practices.

144.    Plaintiffs will continue to fully and adequately protect the interests of the members of each class.  Plaintiffs have retained counsel competent and experienced in antitrust class actions. Plaintiffs have no interests in conflict with those of any class.

145.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.

146.    The prosecution of separate actions by individual members of each class would impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the classes.

147.    A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

148.    The interests of the members of each class in individually controlling the prosecution of separate actions are theoretical rather than practical.  The classes each have a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.   As the damages suffered by some of the individual class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of each class to individually redress the wrongs done to them.  Plaintiffs anticipate no difficulty in the management of this action as a class action.

149.    WHEREFORE, Plaintiffs request that the Court order that this action may be maintained as a class action pursuant to Rules 23(a) and (b) of the Federal Rules of Civil Procedure, that they be named Class Representatives, that Roche Cyrulnik Freedman LLP be named Lead Class Counsel, and that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to each class.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 1 of the Sherman Act
### With Respect to the Restaurant Platform Market
### (by the Restaurant Platform Class)
### (Against Grubhub and Uber)

150.    Plaintiffs incorporate the allegations above.

151.    At all times throughout the class period, Grubhub and Uber possessed market power in the Restaurant Platform Market in both the National Market and the Local Markets.

152.    This market power is demonstrated by Grubhub and Uber's share of the Restaurant Platform Market in these geographic markets, as well as, among other things, their ability to profitably impose supracompetitive pricing on both restaurants and consumers in those markets.

153.    Under section 1 of the Sherman Act, Grubhub and Uber's MFNs constitute vertical agreements with restaurants in restraint of trade or commerce among the several States.

154.    Grubhub and Uber's MFNs constitute unreasonable restraints of trade because they have produced substantial anticompetitive effects in the Restaurant Platform Market in both the National Market and Local Markets without procompetitive justification.

155.    Grubhub and Uber's MFNs have reduced price competition in these markets by prohibiting restaurants from offering lower prices to consumers who order directly from restaurants and by prohibiting restaurants from offering lower prices through competing Restaurant Platforms.

156.    As a direct and proximate result of Grubhub and Uber's anticompetitive conduct, Plaintiffs and each class have suffered pecuniary injury.

157.    Under section 4 of the Clayton Act, Plaintiffs and each class are entitled to treble damages and reasonable attorneys' fees for these injuries.

158.    Under section 16 of the Clayton Act, Plaintiffs and each class are also entitled to injunctive relief.

**COUNT II**
**Violations of Section 1 of the Sherman Act**
**With Respect to the Takeout and Delivery Market and the Sit-Down Market**
**(by the Takeout and Delivery Class and the Sit-Down Class)**
**(Against Defendants)**

159.    Plaintiffs incorporate the allegations above.

160.    At all times throughout the class period, Defendants possessed market power in the Takeout and Delivery Market and the Sit-Down Market in both the National Market and the Local Markets.

161.    This market power is demonstrated by Defendants' ability to profitably impose supracompetitive pricing on both restaurants and consumers in the Takeout and Delivery Market and the Sit-Down Market in these geographic markets.

162.    Under section 1 of the Sherman Act, Defendants' MFNs constitute vertical agreements with restaurants in restraint of trade or commerce among the several States.

163.    Defendants' MFNs constitute unreasonable restraints of trade because they have produced substantial anticompetitive effects in the Takeout and Delivery Market and the Sit-Down Market in both the National Market and Local Markets without procompetitive justification.

164.    Defendants' MFNs have reduced price competition in these markets by prohibiting restaurants from offering lower prices to consumers who order directly from restaurants and, in the case of Grubhub and Uber, prohibiting restaurants from offering lower prices through competing Restaurant Platforms.

165.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and each class have suffered pecuniary injury.

166.    Under section 4 of the Clayton Act, Plaintiffs and each class are entitled to treble damages and reasonable attorneys' fees for these injuries.

167.    Under section 16 of the Clayton Act, Plaintiffs and each class are also entitled to injunctive relief.

**COUNT III**
**Violations of State Antitrust Laws – Agreement in Restraint of Trade**
**With Respect to the Restaurant Platform Market**
**(by the Restaurant Platform Class)**
**(Against Grubhub and Uber)**

168.    Plaintiffs incorporate the allegations above.

169.    Grubhub and Uber have market power in the Restaurant Platform Market in the National Market and Local Markets; their MFNs are anticompetitive agreements that unreasonably restrain trade; and their anticompetitive conduct has proximately harmed Plaintiffs.

170.    Such conduct violates the following state antitrust laws:

a.    Ala. Code § 6-5-60 *et seq.*, which respect to purchases in Alabama;

b.    Alaska Stat. §§ 45.50.562, 45.50.576(a), (b), with respect to purchases in Alaska;

c.    Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona;

d.    Ark. Code Ann. § 4-75-212(b), *et seq.*, with respect to purchases in Arkansas;

e.    Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California;

f.    D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia;

g.    Fla. Stat. § 501.201, *et seq.*, and *Mack v. Bristol-Myers Squibb*, 673 So. 2d 100, 104 (Fla. Dist. Ct. App. 1996), with respect to purchases in Florida;

h.    Hawaii Code § 480, *et seq.*, with respect to purchases in Hawaii;

i.    740 Ill. Comp. Stat. 10/1 *et seq.*, with respect to purchases in Illinois;

j.    Iowa Code §§ 553 *et seq.*, with respect to purchases in Iowa;

k.    Kansas Stat. Ann. § 50-101, *et seq.*, with respect to purchases in Kansas;

l.    Mass. Gen. Laws Ch. 93, § 1, *et seq.*, with respect to purchases in Massachusetts;

m.  Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases in Maine;

n.  Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan;

o.  Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota;

p.  Miss. Code Ann. § 75-21-1, *et seq.*, with respect to purchases in Mississippi;

q.  Missouri Stat. § 416.011, *et seq.*, with respect to purchases in Missouri;

r.  Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska;

s.  Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases in Nevada;

t.  N.H. Rev. Stat. Ann. §§ 356:1, *et seq.*, with respect to purchases in New Hampshire;

u.  N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases in New Mexico;

v.  N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York;

w.  N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases in North Carolina;

x.  N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases in North Dakota;

y.  Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases in Oregon;

z.  P.R. Laws Ann. Tit. 10, § 257, *et seq.*, with respect to purchases in Puerto Rico;

aa. R.I. Gen. Laws § 6-36-1, *et seq.*, with respect to purchases in Rhode Island;

bb. S.D. Codified Laws Ann. §§ 37-1-3, *et seq.*, with respect to purchases in South Dakota;

cc. Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee;

dd. Utah Code § 76-10-3101, *et seq.*, with respect to purchases in Utah;

ee. Vt. Stat. Ann. tit. 9, § 2453, *et seq.*, with respect to purchases in Vermont;

ff.  W. Va. Code §§ 47-18-1, *et seq.*, with respect to purchases in West Virginia; and

gg. Wis. Stat. §§ 133.01, *et seq.*, with respect to purchases in Wisconsin.

171.    As a direct and proximate result of Grubhub and Uber's anticompetitive conduct, Plaintiffs and each class have suffered pecuniary injury.

172.    Plaintiffs and each class are entitled to relief pursuant to the foregoing statutes.

**COUNT IV**
**Violations of State Antitrust Laws – Agreement in Restraint of Trade**
**With Respect to the Takeout and Delivery Market and the Sit-Down Market**
**(by the Takeout and Delivery Class and Sit-Down Class)**
**(Against Defendants)**

173.    Plaintiffs incorporate the allegations above.

174.    Defendants have market power in the Takeout and Delivery Market and the Sit-Down Market in the National Market and Local Markets; Defendants' MFNs are anticompetitive agreements that unreasonably restrain trade; and Defendants' anticompetitive conduct has proximately harmed Plaintiffs.

175.    Such conduct violates the following state antitrust laws:

a.    Ala. Code § 6-5-60 *et seq.*, which respect to purchases in Alabama;

b.    Alaska Stat. §§ 45.50.562, 45.50.576(a), (b), with respect to purchases in Alaska;

c.    Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona;

d.    Ark. Code Ann. § 4-75-212(b), *et seq.*, with respect to purchases in Arkansas;

e.    Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California;

f.    D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia;

g.    Fla. Stat. § 501.201, *et seq.*, and *Mack v. Bristol-Myers Squibb*, 673 So. 2d 100, 104 (Fla. Dist. Ct. App. 1996), with respect to purchases in Florida;

h.    Hawaii Code § 480, *et seq.*, with respect to purchases in Hawaii;

i.    740 Ill. Comp. Stat. 10/1 *et seq.*, with respect to purchases in Illinois;

j.    Iowa Code §§ 553 *et seq.*, with respect to purchases in Iowa;

k.   Kansas Stat. Ann. § 50-101, *et seq.*, with respect to purchases in Kansas;

l.   Mass. Gen. Laws Ch. 93, § 1, *et seq.*, with respect to purchases in Massachusetts;

m.   Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases in Maine;

n.   Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan;

o.   Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota;

p.   Miss. Code Ann. § 75-21-1, *et seq.*, with respect to purchases in Mississippi;

q.   Missouri Stat. § 416.011, *et seq.*, with respect to purchases in Missouri;

r.   Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska;

s.   Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases in Nevada;

t.   N.H. Rev. Stat. Ann. §§ 356:1, *et seq.*, with respect to purchases in New Hampshire;

u.   N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases in New Mexico;

v.   N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York;

w.   N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases in North Carolina;

x.   N.D. Cent. Code §§ 51-08.1-01, *et seq.*, with respect to purchases in North Dakota;

y.   Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases in Oregon;

z.   P.R. Laws Ann. Tit. 10, § 257, *et seq.*, with respect to purchases in Puerto Rico;

aa.   R.I. Gen. Laws § 6-36-1, *et seq.*, with respect to purchases in Rhode Island;

bb.   S.D. Codified Laws Ann. §§ 37-1-3, *et seq.*, with respect to purchases in South Dakota;

cc.   Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee;

dd.   Utah Code § 76-10-3101, *et seq.*, with respect to purchases in Utah;

ee.   Vt. Stat. Ann. tit. 9, § 2453, *et seq.*, with respect to purchases in Vermont;

ff.   W. Va. Code §§ 47-18-1, *et seq.*, with respect to purchases in West Virginia; and

gg. Wis. Stat. §§ 133.01, *et seq.*, with respect to purchases in Wisconsin.

176.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and each class have suffered pecuniary injury.

177.    Plaintiffs and each class are entitled to relief pursuant to the foregoing statutes.

<u>**COUNT V**</u>
**Monopolization in Violation of Section 2 of the Sherman Act**
**With Respect to the Monopolized Restaurant Platform Local Markets**
**(by the Monopolized Restaurant Platform Local Markets Class)**
**(Against Grubhub and Uber)**

178.    Plaintiffs incorporate the allegations above.

179.    At all times throughout the class period, Grubhub and Uber possessed monopoly power in the Restaurant Platform Market in the Monopolized Restaurant Platform Local Markets.

180.    Grubhub and Uber's monopoly power enables them to profitably charge supracompetitive prices to both restaurants and consumers and exclude competitors.

181.    Grubhub and Uber have willfully acquired and maintained that power through exclusionary conduct.  In particular, Grubhub and Uber have utilized their MFNs to reduce price competition in the Monopolized Restaurant Platform Local Markets and to discourage entry into those markets.

182.    As a direct and proximate result of Grubhub and Uber's anticompetitive conduct, Plaintiffs and each class have suffered pecuniary injury.

183.    Under section 4 of the Clayton Act, Plaintiffs and each class are entitled to treble damages and reasonable attorneys' fees for those injuries.

184.    Under section 16 of the Clayton Act, Plaintiffs and each class are also entitled to injunctive relief.

<u>COUNT VI</u>
**Attempted Monopolization in Violation of Section 2 of the Sherman Act
With Respect to the Monopolized Restaurant Platform Local Markets
(by the Monopolized Restaurant Platform Local Markets Class)
(Against Grubhub and Uber)**

185.   Plaintiffs incorporate the allegations above.

186.   Grubhub and Uber have engaged in anticompetitive conduct with respect to the Monopolized Restaurant Platform Local Markets.

187.   Grubhub and Uber engaged in such anticompetitive with the specific intent of monopolizing the Monopolized Restaurant Platform Local Markets.  Grubhub and Uber's conduct indicates, for example, that they sought to reduce price competition, exclude existing competitors, and discourage prospective competitors from entering those markets.

188.   Grubhub and Uber had and have a dangerous probability of successfully monopolizing the Monopolized Restaurant Platform Local Markets.

189.    As a direct and proximate result of Grubhub and Uber's anticompetitive conduct, Plaintiffs and each class have suffered pecuniary injury.

190.   Under section 4 of the Clayton Act, Plaintiffs and each class are entitled to treble damages and reasonable attorneys' fees for those injuries.

191.   Under section 16 of the Clayton Act, Plaintiffs and each class are also entitled to injunctive relief.

## COUNT VII
### Monopolization in Violation of Section 2 of the Sherman Act
### With Respect to the Monopolized Takeout and Delivery Local Markets
### (by the Monopolized Takeout and Delivery Local Markets Class and
### by the Sit-Down Local Markets Class)
### (Against Defendants)

192.    Plaintiffs incorporate the allegations above.

193.    At all times throughout the class period, Defendants possessed monopoly power in the Monopolized Takeout and Delivery Local Markets.

194.    Defendants' monopoly power enables them to profitably charge supracompetitive prices to both restaurants and consumers and exclude competitors.

195.    Defendants have willfully acquired and maintained that power through exclusionary conduct.   In particular, Defendants have utilized their MFNs to reduce price competition in the Monopolized Takeout and Local Delivery Markets and to discourage entry into those markets.

196.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and each class have suffered pecuniary injury.

197.    Under Section 4 of the Clayton Act, Plaintiffs and each class are entitled to treble damages and reasonable attorneys' fees for those injuries.

198.    Under Section 16 of the Clayton Act, Plaintiffs and each class are also entitled to injunctive relief.

## COUNT VIII
**Attempted Monopolization in Violation of Section 2 of the Sherman Act
With Respect to the Monopolized Takeout and Delivery Local Markets
(by the Monopolized Takeout and Delivery Local Markets Class and
by the Sit-Down Local Markets Class)
(Against Defendants)**

199.    Plaintiffs incorporate the allegations above.

200.    Defendants have engaged in anticompetitive conduct with respect to the Monopolized Takeout and Delivery Local Markets.

201.    Defendants engaged in such anticompetitive with the specific intent of monopolizing the Monopolized Takeout and Delivery Local Markets.  Defendants' conduct indicates, for example, that they sought to reduce price competition, exclude existing competitors, and discourage prospective competitors from entering those markets.

202.    Defendants had and have a dangerous probability of successfully monopolizing the Monopolized Takeout and Delivery Local Markets.

203.     As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and each class have suffered pecuniary injury.

204.    Under section 4 of the Clayton Act, Plaintiffs and each class are entitled to treble damages and reasonable attorneys' fees for those injuries.

205.    Under section 16 of the Clayton Act, Plaintiffs and each class are also entitled to injunctive relief.

### COUNT IX
**Violation of State Antitrust Laws – Monopolization**
**With Respect to the Monopolized Restaurant Platform Local Markets**
**(by the Monopolized Restaurant Platform Local Markets Class)**
**(Against Grubhub and Uber)**

206.    Plaintiffs incorporate the allegations above.

207.    Grubhub and Uber possess monopoly power in the Monopolized Restaurant Platform Local Markets and willfully acquired and maintained it through exclusionary conduct.

208.    Such conduct violates at least the following state antitrust laws:

  a.    D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia;

  b.    Fla. Stat. § 501.201, *et seq.*, and *Mack v. Bristol-Myers Squibb*, 673 So. 2d 100, 104 (Fla. Dist. Ct. App. 1996), with respect to purchases in Florida;

  c.    740 Ill. Comp. Stat. 10/1 *et seq.*, with respect to purchases in Illinois;

  d.    Mass. Gen. Laws Ch. 93, § 1, *et seq.*, with respect to purchases in Massachusetts; and

  e.    N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York.

209.    As a direct and proximate result of Grubhub and Uber's anticompetitive conduct, Plaintiffs and each class have suffered pecuniary injury.

210.    Plaintiffs and each class are entitled to relief pursuant to the foregoing statutes.

### COUNT X
**Violation of State Antitrust Laws – Attempted Monopolization**
**With Respect to the Monopolized Restaurant Platform Local Markets**
**(by the Monopolized Restaurant Platform Local Markets Class)**
**(Against Grubhub and Uber)**

211.    Plaintiffs incorporate the allegations above.

212.    Grubhub and Uber engaged in anticompetitive conduct with the specific intent of monopolizing the Monopolized Restaurant Platform Local Markets and had and have a dangerous probability of successfully monopolizing those markets.

213.    Such conduct violates at least the following state antitrust laws:

    a.   D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia;

    b.   Fla. Stat. § 501.201, *et seq.*, and *Mack v. Bristol-Myers Squibb*, 673 So. 2d 100, 104 (Fla. Dist. Ct. App. 1996), with respect to purchases in Florida;

    c.   740 Ill. Comp. Stat. 10/1 *et seq.*, with respect to purchases in Illinois;

    d.   Mass. Gen. Laws Ch. 93, § 1, *et seq.*, with respect to purchases in Massachusetts; and

    e.   N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York.

214.    As a direct and proximate result of Grubhub and Uber's anticompetitive conduct, Plaintiffs and each class have suffered pecuniary injury.

215.    Plaintiffs and each class are entitled to relief pursuant to the foregoing statutes.

## <u>COUNT XI</u>
### Violation of State Antitrust Laws – Monopolization
### With Respect to the Monopolized Takeout and Delivery Local Markets
### (by the Monopolized Takeout and Delivery Local Markets Class and
### by the Sit-Down Local Markets Class)
### (Against Defendants)

216.    Plaintiffs incorporate the allegations above.

217.    Defendants possess monopoly power in the Monopolized Takeout and Delivery Local Markets and willfully acquired and maintained it through exclusionary conduct.

218.    Such conduct violates at least the following state antitrust laws:

    a.   Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California;

    b.   Fla. Stat. § 501.201, *et seq.*, and *Mack v. Bristol-Myers Squibb*, 673 So. 2d 100, 104 (Fla. Dist. Ct. App. 1996), with respect to purchases in Florida;

    c.   740 Ill. Comp. Stat. 10/1 *et seq.*, with respect to purchases in Illinois; and

    d.   N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York.

219.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and each class have suffered pecuniary injury.

220.    Plaintiffs and each class are entitled to relief pursuant to the foregoing statutes.

**COUNT XII**
**Violation of State Antitrust Laws – Attempted Monopolization**
**With Respect to the Monopolized Takeout and Delivery Local Markets**
**(by the Monopolized Takeout and Delivery Local Markets Class and**
**by the Sit-Down Local Markets Class)**
**(Against Defendants)**

221.    Plaintiffs incorporate the allegations above.

222.    Defendants engaged in anticompetitive conduct with the specific intent of monopolizing the Monopolized Takeout and Delivery Local Markets and had and have a dangerous probability of successfully monopolizing those markets.

223.    Such conduct violates at least the following state antitrust laws:

   a.  Cal. Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California;

   b.  Fla. Stat. § 501.201, *et seq.*, and *Mack v. Bristol-Myers Squibb*, 673 So. 2d 100, 104 (Fla. Dist. Ct. App. 1996), with respect to purchases in Florida;

   c.  740 Ill. Comp. Stat. 10/1 *et seq.*, with respect to purchases in Illinois; and

   d.  N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York.

224.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiffs and each class have suffered pecuniary injury.

225.    Plaintiffs and each class are entitled to relief pursuant to the foregoing statutes.

**DEMAND FOR JURY TRIAL**

226.    Plaintiffs respectfully demand a jury trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

(a) Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) and direct that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2) be given to the classes;

(b) Require Defendants to pay for sending notice to the certified classes;

(c) Appoint Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

(d) Issue an injunction to enjoin Defendants from continuing to engage in the anticompetitive conduct alleged in this Complaint;

(e) Award compensatory damages to Plaintiffs and the proposed classes in an amount to be established at trial;

(f) Award treble damages as permitted by law;

(g) Award pre- and post-judgment interest;

(h) Award reasonable attorneys' fees and costs; and

(i) Award any other and further relief as may be just and proper.


Dated:  July 6, 2020

/s/ *Kyle W. Roche*
Kyle W. Roche
Edward Normand
Stephen Lagos
ROCHE CYRULNIK FREEDMAN LLP
99 Park Avenue, 19th Floor
New York, NY 10016
kyle@rcfllp.com
tnormand@rcfllp.com
slagos@rcfllp.com

*Attorneys for Plaintiffs*