UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MARIAM DAVITASHVILI, *et al.*,

       Plaintiffs,

   v.

GRUBHUB INC., *et al.*,

       Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3 / 30 / 2022
```

20-cv-3000 (LAK)
and consolidated case

## MEMORANDUM OPINION

Appearances:

   Gregory A. Frank
   Marvin L. Frank
   Asher Hawkins
   FRANK LLP

   Kyle W. Roche
   Edward Normand
   Stephen Lagos
   ROCHE CYRULNIK FREEDMAN LLP

   *Attorneys for Plaintiffs*

   Steven C. Sunshine
   Karen M. Lent
   Evan Kreiner
   SKADDEN, ARPS, SLATE, MEAGHER, & FLOM LLP
   *Attorneys for Defendant Postmates Inc.*

   Derek Ludwin
   Stacey K. Grigsby
   Andrew A. Ruffino
   COVINGTON & BURLING LLP
   *Attorneys for Defendant Uber Technologies, Inc.*

David J. Lender
Eric S. Hochstadt
WEIL, GOTSHAL & MANGES LLP
*Attorneys for Defendant Grubhub Inc.*

LEWIS A. KAPLAN, *District Judge.*

   This putative class action involves the contractual relationships between restaurants and online platforms for restaurant meals.  The amended complaint alleges that three defendants – Grubhub, Inc. ("Grubhub"), Uber Technologies, Inc. ("Uber" or "Uber Eats"), and Postmates Inc. ("Postmates") (together, "Defendants") – each unlawfully has fixed prices for restaurant meals by entering into restrictive agreements with restaurants that preclude those restaurants from charging lower prices off-platform, *i.e.*, in the "direct" markets for restaurant meals and/or on other restaurant platforms.  Plaintiffs claim that Defendants thus have caused them to pay artificially high prices for restaurant meals.[1]  They seek damages and injunctive relief under Section 1 of the Sherman Act and its state analogues on behalf of themselves and three nationwide classes of others similarly situated.

   Before the Court is Defendants' joint motion to dismiss the amended complaint.  Defendants contend that the contracts at issue do not fix prices in a manner sufficient to state an antitrust claim.  For the following reasons, the motion is denied.

### *Facts*

   The relevant facts alleged in the amended complaint are deemed true for purposes of this motion.  They are summarized as follows:

---

[1]   Am. Compl. (Dkt. 28) ¶¶ 1, 188-216.  All docket citations are to No. 20-cv-3000 (LAK).

*Background*

Defendants operate electronic, internet based meal ordering platforms, which allow customers to order restaurant food online.[2]   They are "two-sided platforms, acting as . . . intermediar[ies] to connect restaurants and consumers."[3]  Along with the rise of the internet, such platforms have become increasingly popular means of buying and selling restaurant food, especially since the early 2010s.[4]  They aggregate the menus of participating restaurants within pick up or delivery range of the user and permit the user to view and compare offerings before placing an order from a single restaurant.[5]  In exchange for their services, restaurant platforms collect commissions and fees on each transaction from both their restaurant and consumer customers.  At issue in this lawsuit is Defendants' practice of imposing contractual "no price competition clauses" ("NPCCs") on listed restaurants.  All three Defendants' NPCCs prevent their restaurant customers from charging lower list prices to consumers who dine in person or who order food takeout or delivery directly from the restaurant.  Grubhub and Uber have more expansive NPCCs, which prevent their restaurant customers from charging lower prices to consumers who purchase their meals on rival restaurant platforms.

The amended complaint pleads four counts of vertical price fixing stemming from these arrangements.  Counts I and III charge Defendants with unlawfully setting minimum prices

---

[2]

*Id.* ¶¶ 25-28.

[3]

*Id.* ¶ 36.

[4]

*Id.* ¶¶ 2, 25.

[5]

*Id.* ¶¶ 25-28.

4

in the local direct markets for restaurant meals (*i.e.*, for dine-in meals and for meals for takeout and delivery coordinated through the restaurant).   Counts II and IV claim that defendants Grubhub and Uber similarly have set unlawful minimum prices throughout the restaurant platform market, both on the national and local levels.   Because restaurant platform commissions force restaurants to raise their list prices to make money – or even break even – on each transaction, Plaintiffs allege that Defendants' NPCCs have caused anticompetitive effects in the relevant markets and harmed Plaintiffs directly by causing them to pay supracompetitive prices for restaurant meals.

*The Parties*

    A.    *Plaintiffs*

        There are eight named plaintiffs in this case.   Each is a natural person who resides in and is a citizen of the State of New York.[6]   Over the relevant period, plaintiffs Mariam Davitashvili, Adam Bensimon, and Mia Sapienza have ordered meals for "takeout, delivery, and dine-in directly from restaurants that sell their goods through Defendants' platforms."[7]   Plaintiffs Phil Eliades and Jonathan Swaby have done the same, but also have ordered "indirectly from such restaurants through Doordash."[8]   Plaintiff John Boisi "has placed orders for takeout and dine-in directly from restaurants that sell their goods through Grubhub and Postmates, and indirectly from

---

[6]

    *Id.* ¶¶ 10-17.

[7]

    *Id.* ¶¶ 10-12.

[8]

    *Id.* ¶¶ 13-14.

such restaurants through Caviar and Doordash."[9]  Plaintiff Nate Obey "has placed orders for takeout and dine-in directly from restaurants that sell their goods through Grubhub, and indirectly from such restaurants through Caviar."[10]  Meanwhile, plaintiff Malik Drewey "has placed orders for takeout and dine-in directly from restaurants that sell their goods through each Defendant's platform, but he has not used any of those platforms."[11]

Plaintiffs purport to represent three classes of similarly-situated consumers.  *First*, the Direct Takeout and Delivery Class, which "comprises all persons or entities in the United States who have purchased goods, for takeout or delivery by the restaurant, directly from a restaurant subject to any Defendant's NPCC."[12]  *Second*, the Dine-In Class which "comprises all persons or entities in the United States who have purchased goods, for dining in the restaurant, from a restaurant subject to any Defendant's NPCC."[13]  *Third*, the Restaurant Platform Class which "comprises all persons or entities in the United States who have purchased goods, through a non-Defendant Restaurant Platform, from a restaurant subject to Grubhub's or Uber's NPCCs."[14]

---

[9]  *Id.* ¶ 15.

[10]  *Id.* ¶ 16.

[11]  *Id.* ¶ 17.

[12]  *Id.* ¶ 173.

[13]  *Id.* ¶ 174.

[14]  *Id.* ¶ 175.

6

*B.     Defendants*

Defendants Grubhub, Uber, and Postmates are horizontal competitors that operate platforms for restaurant takeout and delivery orders.  Each operates throughout the United States.

*The Relevant Markets*

Plaintiffs have pleaded three separate product markets.  *First*, they allege a Restaurant Platform Market in which Defendants compete for restaurant meal transactions.[15]  In this market, consumers can "search for participating restaurants in a locality and order food for takeout and delivery, through the same platform from those restaurants."[16]  *Second*, Plaintiffs allege a Direct Takeout and Delivery Market, in which "a consumer may order directly from a restaurant for takeout or delivery by, for example, calling the restaurant's phone number or by visiting the restaurant's website."[17]  *Third*, they allege a Dine-In Market, in which a consumer may order and eat a meal at a restaurant.[18]

In addition, Plaintiffs plead both national and local geographic markets.  Plaintiffs' alleged Restaurant Platform Market encompasses platform business throughout the United States. The Direct Takeout and Delivery Market and the Dine-In Market are inherently local because consumers realistically will order food from or visit only a restaurant that is relatively close by.

---

[15]     *Id.* ¶¶ 29, 46.

[16]     Pl. Mem. (Dkt. 40) at 3.

[17]     Am. Compl. ¶ 30.

[18]     *Id.*

Plaintiffs allege also that Defendants compete locally in the Restaurant Platform Market, both for "listings from restaurants" and "delivery and takeout orders from consumers."[19]  The local markets include New York City, Los Angeles, Chicago, Dallas-Fort Worth, Houston, Miami, Philadelphia, Atlanta, Boston, Phoenix, and the San Francisco Bay Area.[20]

*Market Shares*

Four restaurant platforms – Doordash and Defendants Grubhub, Uber, and Postmates – account for 98 percent of the market for meals purchased through restaurant platforms in the United States.[21]  As of November 2019, Doordash was the national leader with a market share of 37 percent, while Defendants Grubhub, Uber, and Postmates held respective national market shares of 31 percent, 20 percent, and 10 percent.[22]  Defendants' local market shares vary by region, but Plaintiffs allege that each Defendant is dominant in at least one metropolitan area.  For example, Grubhub holds 67 percent of the restaurant platform market in New York City, Uber holds 55 percent of the market in Miami, and Postmates holds 37 percent of the market in Los Angeles.[23]  In July 2020, it was announced that Uber would acquire Postmates.[24]

---

[19]     *Id.* ¶ 98.

[20]     *Id.* ¶ 99.

[21]     *Id.* ¶¶ 31-32.

[22]     *Id.* ¶ 33.

[23]     *Id.* ¶ 34.

[24]     *Id.* ¶¶ 21, 39.

Plaintiffs offer several explanations for this concentration.  Indirect network effects are at work in the restaurant platform markets because "the value that [the restaurant platforms] offer to one side of the platform is a function of the extent of the use of the other side of the platform."[25] In other words, a restaurant platform is more attractive to a given user if it lists many restaurants and more valuable to a given restaurant if it is used by many prospective customers.  Indirect network effects thus reinforce the dominant positions of the few platforms that can offer access to the largest networks of restaurants and consumers.  This might explain also why the platforms "split their dominance regionally," with one restaurant platform usually dominant in each metropolitan area.[26] Restaurant platforms are also "sticky," meaning consumers – for a variety of reasons, including familiarity and convenience – are unlikely to switch platforms.[27]  In addition, as explained below, Plaintiffs allege that Defendants' anticompetitive conduct contributes to their market dominance by preventing restaurants and other restaurant platforms from competing with them on price.

*Commissions and Fees*

In exchange for connecting restaurants to consumers, restaurant platforms charge commissions and fees on both sides of each transaction.[28]  *First*, the platforms charge a restaurant commission, which is typically calculated as a certain rate multiplied by the total price of the

---

[25]

*Id.* ¶ 66.

[26]

*See id.* ¶ 34 (listing Defendants' respective market shares in each local market).

[27]

*Id.* ¶¶ 87, 106-107.

[28]

*Id.* ¶¶ 40-45.

customer's order plus any delivery fee charged by the restaurant.[29]   According to the amended complaint, Defendants typically charge a 30 percent commission rate to restaurants that do not provide their own delivery and a lower rate to restaurants that do provide their own delivery.

*Second*, restaurant platforms charge service fees to the consumer.  Like the restaurant commission, the service fee is generally equal to a rate multiplied by the total list price of the customer's order.  Plaintiffs allege that the service fee is typically between 5 percent and 10 percent, but they concede that in certain cases – including for pick up orders and cases in which the restaurant does its own delivery – no service fee is charged.[30]

*Third*, the platforms generally charge a 5 percent delivery fee to customers in cases where the restaurant uses the platform's delivery services.[31]

Plaintiffs contend that these rates are supracompetitive.   Defendants' current commission rates – at least, when the platform is providing delivery – are "triple what they were in 2004 and almost double what they were in 2015."[32]  Other platforms provide the same services at lower rates.[33]  Plaintiffs point to Defendants' alleged market power and indirect network effects as

---

[29]   *Id.* ¶¶ 41-42.

[30]   *Id.* ¶ 43.

[31]   *Id.* ¶ 44.

[32]   Pl. Mem. at 4; Am. Compl. ¶¶ 109, 112-13, 115, 118.

[33]   Am. Compl. ¶ 110.

10

the primary economic reasons why Defendants are able to impose rates which, according to one survey, 90 percent of restaurants have deemed subjectively "unreasonable."[34]

*The Alleged Restraints*

At the heart of this dispute is Plaintiffs' allegation that each of these defendants requires each restaurant listed on its platform to enter into a restrictive agreement – an NPCC – which prevents the restaurant from offering the same menu items directly to consumers or, in some cases, on other restaurant platforms at a lower price than the restaurant charges on the defendant's platform.[35] A "narrow" NPCC prohibits the product's sale at a lower price only when the restaurant sells to consumers directly.[36] A "wide" NPCC prohibits restaurants from selling products *anywhere* at a price lower than that charged on the restaurant platform in question. This includes prices for direct sales and on other restaurant platforms.[37]

Postmates imposes a narrow NPCC that requires restaurants that use its platform to maintain "price parity between in-store and online menus."[38] This means that

> "any restaurant that sells goods through Postmates is contractually prohibited from selling those goods at a lower price to consumers who purchase directly from that restaurant, regardless of whether the meal is for takeout, delivery, or dine-in, and regardless of whether that meal was ordered online, by phone, or in person. The

---

34

    *Id.* ¶ 115.

35

    *Id.* ¶¶ 55-56.

36

    *Id.* ¶ 56.

37

    *Id.*

38

    *Id.* ¶ 57.

restaurant may, however, charge a lower price when it sells its goods through a competing platform, such as Doordash."[39]

Grubhub and Uber, however, both impose wide NPCCs that prohibit restaurants from selling meals at lower prices "through any competing restaurant platform" or through direct orders placed by consumers.[40]   Grubhub's NPCC states that

> "[t]he item pricing must be at least as favorable to the consumer as that which is available for Restaurant's standard menu or offered to any 3rd party service,"[41]

and Uber's NPCC provides that a

> "Merchant may not make any Item available to Customers through the [Uber] Eats App at a price that is higher than the price that Merchant charges in-store for similar Items . . . [nor] at a price higher than the amount Merchant is charging for similar Items through any comparable platform for food delivery services."[42]

Plaintiffs note that DoorDash, the market leader, does not impose an NPCC on restaurants that sell on its platform.  Instead, it allows restaurants to "increase prices on that platform to offset the delivery app's commission fees, without increasing the in-house restaurant list price."[43]

Plaintiffs allege that Defendants' NPCCs are designed to inhibit competition and in fact have significant anticompetitive effects.  Restaurants make very low profit margins, usually

---

[39]      *Id.* ¶ 58.

[40]      *Id.* ¶ 59.

[41]      *Id.* ¶ 60.

[42]      *Id.* ¶ 61.

[43]      *Id.* ¶ 62.

below 15 percent.[44]  This means that a restaurant typically must make a high volume of sales to stay afloat.  It means also that restaurants cannot realistically forgo listing their menus on Defendants' platforms, even though restaurant commission rates – which can reach up to 30 percent – are likely to swallow most restaurants' profits.

The platforms' reach is hard to overstate.  Restaurant platforms now capture 80 percent of online orders for meal delivery.[45]  Millions of customers order food through one or more platforms.[46]  And because restaurant platforms are "sticky" and many consumers use only one platform, most restaurants contract with multiple platforms in order to reach as many potential customers as possible.[47]  Defendants are the second, third, and fourth largest restaurant platforms nationally and each dominates at least one of the local markets.  Accordingly, it is exceedingly difficult for restaurants to avoid being bound by Defendants' NPCCs.  And once they are so bound, restaurants cannot lower their list prices – either for direct purchases or on platforms that charge lower commissions or fees – in order to offset the costs they incur on Defendants' platforms.  Given these pressures, it makes sense that restaurants have been forced to raise prices to counteract Defendants' high commission rates.

---

[44]     *Id.* ¶ 75.

[45]     *Id.* ¶¶ 113.

[46]     *Id.* ¶¶ 78-79, 104.

[47]     *Id.* ¶¶ 85-88, 126.

### *Discussion*

*Legal Standard*

 A.     *Motion to Dismiss*

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint must allege sufficient facts to "state a claim to relief that is plausible on its face."[48] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[49] The Court accepts as true all factual allegations made in the complaint, but does not credit "mere conclusory statements" nor "threadbare recitals of the elements of a cause of action."[50] The Court considers also any documents attached to the complaint or incorporated therein by reference.[51]

 B.     *Relevant Antitrust Principles*

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."[52]

---

[48]  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[49]  *Id.*

[50]  *Id.*

[51]  *DiFolco v. MSNBC Cable L.L.C.*, 662 F.3d 104, 111 (2d Cir. 2010).

[52]  15 U.S.C. § 1.

"A violation of Section 1 generally requires a combination or other form of concerted action between two legally distinct entities resulting in an unreasonable restraint on trade."[53]

Combinations, conspiracies and agreements "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity" commonly are referred to as price-fixing arrangements.[54]  Agreements between or among competitors are characterized as "horizontal" while those between or among entities at different levels of distribution – *e.g.*, manufacturer and wholesaler or wholesaler and retailer – are referred to as "vertical." Horizontal restraints on competition – notably but not exclusively price fixing – are unlawful *per se.*  Vertical restraints, including resale price restraints, are evaluated according to the rule of reason.[55] As plaintiffs contend that Defendants' NPCCs are vertical price-fixing arrangements, they come under the rule of reason.  So we come to the question of what is required in order to state a legally sufficient claim.

As a general matter, a private plaintiff bringing a claim under the Sherman Act must "(1) define the relevant market, (2) allege an antitrust injury, and (3) allege conduct in violation of the antitrust laws."[56]  So here Plaintiffs must allege facts which, assuming their truth and drawing

---

[53]

E & L Consulting, Ltd. v. Doman Indus. Ltd., 472 F.3d 23, 29 (2d Cir. 2006).

[54]

Dennis v. JPMorgan Chase & Co., 343 F. Supp. 3d 122, 171 n.212 (S.D.N.Y. 2018) (quoting United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223 (1940)).

[55]

Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 881 (2007).

[56]

Concord Assocs., L.P. v. Ent. Props. Tr., 817 F.3d 46, 52 (2d Cir. 2016) (internal citation omitted).

The qualification relates to the fact that definition of a relevant market typically is unnecessary in a case alleging a *per se* antitrust violation such as horizontal price fixing.

from them all reasonable and favorable inferences, would suffice to permit a fnding of relevant market or markets and an antitrust injury.  In order to satisfy the requirement of pleading conduct in violation of the antitrust laws, they must allege also the concerted action essential to stating a Sherman Act Section 1 claim, which they obviously have done by alleging Defendants' agreements with restaurants, and that Defendants' conduct otherwise violates the antitrust laws.

### 1.    *Market Definition*

A plaintiff bringing a claim under the rule of reason must plead facts that plausibly support its proposed definition of the relevant market.[57]  A relevant market has two components: a relevant product and a relevant geographic scope.[58]  The boundaries of the alleged product market must be rationally related to an "analysis of the interchangeability of use or the cross-elasticity of demand."[59]  A geographic market is normally the geographic "area of effective competition," which courts measure "by determining the areas in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product."[60]  Market definition is a "deeply fact-

---

[57] *E.g.*, *In re Mercedes-Benz Anti-Tr. Litig.*, 157 F. Supp. 2d 355, 364 (D.N.J. 2001) ("[R]equiring market definition . . . in all cases would undermine the presumption of anticompetitive effect in the context of *per se* antitrust violations.") (citing *Pace Elecs., Inc. v. Canon Comput. Sys., Inc.*, 213 F.3d 118, 123 (3d Cir. 2000)).

[58] *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 & n.7 (2018).

[59] *Concord Assocs.*, 817 F.3d at 52 (citing *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 574 (S.D.N.Y. 2011)).

[60] *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001) (internal citation omitted).

*Concord Assocs.*, 817 F.3d at 53 (internal citations omitted).

intensive inquiry, [and] courts hesitate to grant motions to dismiss for failure to plead a relevant product market."[61] This Court nonetheless should dismiss Plaintiffs' claims if their proposed market definition is not plausible.[62]

### 2.    *Anticompetitive Effects*

In rule of reason cases, the legality of a challenged restraint ultimately – *i.e.,* on summary judgment or at trial – is evaluated in accordance with a three-step burden-shifting framework.

"First, a plaintiff bears the initial burden of demonstrating that a defendant's challenged behavior 'had an actual adverse effect on competition as a whole in the relevant market.' *Capital Imaging,* 996 F.2d at 543. Examples of actual anticompetitive effects include reduced output, decreased quality, and supracompetitive pricing. *See Tops Mkts.,* 142 F.3d at 96; *Capital Imaging,* 996 F.2d at 546–47.

"If the plaintiff cannot establish anticompetitive effects directly by showing an actual adverse effect on competition as a whole within the relevant market, he or she nevertheless may establish anticompetitive effects indirectly by showing that the defendant has 'sufficient market power to cause an adverse effect on competition.' *Tops Mkts.,* 142 F.3d at 96; *see also K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 129 (2d Cir. 1995) ('"[W]here the plaintiff is unable to demonstrate [an actual adverse effect on competition,] . . . it must at least establish that defendants possess the requisite market power' and thus the capacity to inhibit competition market-wide.' (quoting *Capital Imaging,* 996 F.2d at 546)). Because '[m]arket power is but a "surrogate for detrimental effects,"' *Tops Mkts.,* 142 F.3d at 96 (quoting *FTC v. Ind. Fed'n of Dentists,* 476 U.S. 447, 461, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986)), '[a] plaintiff seeking to use market power as a proxy for adverse effect must show market power, plus some other ground for believing that the challenged behavior could harm competition in the market, such as the inherent anticompetitive nature of the defendant's behavior or the structure of the interbrand market,' *id.* at 97.

---

[61]    *Todd,* 275 F.3d at 199 (internal citation omitted).

[62]    *See id.* at 200-201.

> "Once the plaintiff satisfies its initial burden to prove anticompetitive effects, the burden shifts to the defendant to offer evidence of any procompetitive effects of the restraint at issue. *See Geneva Pharms.*[*Tech. Corp. v. Barr Lab'ys. Inc.*, 386 F.3d 485, 507 (2d Cir. 2004)]. If the defendant can provide such proof, then 'the burden shifts back to the plaintiff[ ] to prove that any legitimate competitive benefits offered by defendant[ ] could have been achieved through less restrictive means.' *Id.* (citing *Capital Imaging,* 996 F.2d at 543)."[63]

But at the pleading stage, only the first step of this framework is material, as consideration of alleged procompetitive effects of defendants' actions and the ultimate judgment of whether any procompetitive effects "outweigh" any anticompetitive effects is inappropriate on a motion addressed to the sufficiency of the complaint.[64] As Judge Rakoff aptly has put it when a defendant opposed a motion to dismiss a rule of reason antitrust claim on the basis that its actions had procompetitive benefits:

> "Defendant counters that [it] provides many pro-competitive benefits [citation omitted] and also disputes the conclusions that plaintiff purports to draw from the . . . studies [plaintiff cited]. [Citation omitted] Defendant's counter-assertions, while certainly worth a fact-finder's consideration, do not persuade the Court to grant a motion to dismiss. The Court hence determines that plaintiff has plausibly pleaded adverse effects in the relevant market. Consequently, the Court finds that plaintiff has presented a plausible claim of a vertical conspiracy under Section 1 of the Sherman Act."[65]

---

[63]

    *United States v. Am. Express Co.*, 838 F.3d 179, 194 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018).

[64]

    *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 239 (S.D.N.Y. 2019) (quoting *Maxon Hyundai Mazda v. Carfax, Inc.*, No. 13-cv-2680 (AJN), 2014 WL 4988268, at *9 (S.D.N.Y. Sept. 29, 2014)).

[65]

    *Meyer v. Kalanick,* 174 F. Supp.2d 817, 828 (S.D.N.Y. 2016).

3.     *Antitrust Standing*

Section 4 of the Clayton Act creates a private cause of action for damages under the antitrust laws, including Section 1 of the Sherman Act.[66]  Section provides also for injunctive relief "against threatened loss or damage by a violation of the antitrust laws."[67]  A private plaintiff who brings a case under these provisions, in addition to pleading adeqautely the other elements of his or her claim, must plead constitutional standing under Article III and antitrust standing.[68]

Defendants have not challenged Plaintiffs' Article III standing on this motion to dismiss.   Nor do they argue explicitly that Plaintiffs lack antitrust standing to bring suit.  Nonetheless, because the principles of antitrust standing underlie Defendants' arguments regarding Plaintiffs' purported failure to plead antitrust injury in the relevant markets, the Court will briefly explain the law that governs its analysis.

Courts evaluating antitrust standing must determine that a plaintiff plausibly has alleged (a) injury in fact, (b) antitrust injury, and (c) that he or she is an acceptable plaintiff to pursue the violation, or, in other words, that he or she would be an efficient enforcer of the antitrust laws.[69]

---

[66]

    *See* 15 U.S.C. §§ 15(a), 26.

[67]

    *See* 15 U.S.C. § 26.

    Unlike Section 4, which in general requires a private plaintiff to prove actual loss in order to recover damages, a plaintiff seeking injunctive relief under Section 16 "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur."  *Zenith Radio Corp. v. Hazeltine Rsch.*, 395 U.S. 100, 130 (1969).

[68]

    *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters ("AGC")*, 459 U.S. 519, 535 n.31 (1983).

[69]

    *Id.*

In deciding whether the plaintiff has pleaded antitrust injury, the Second Circuit requires that we

> "employ a three-step process for determining whether a plaintiff has sufficiently alleged antitrust injury. First, the party asserting that it has been injured by an illegal anticompetitive practice must 'identify[] the practice complained of and the reasons such a practice is or might be anticompetitive.' *Port Dock [& Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 122 (2d Cir. 2007)]. Next, we identify the 'actual injury the plaintiff alleges.' *Id.* This requires us to look to the ways in which the plaintiff claims it is in a 'worse position' as a consequence of the defendant's conduct. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 486 (1977). Finally, we 'compar[e]' the 'anticompetitive effect of the specific practice at issue' to 'the actual injury the plaintiff alleges.' *Port Dock*, 507 F.3d at 122. It is not enough for the actual injury to be 'causally linked' to the asserted violation. *Brunswick*, 429 U.S. at 489 . . . . Rather, in order to establish antitrust injury, the plaintiff must demonstrate that its injury is 'of the type the antitrust laws were intended to prevent and that flows from that which makes [or might make] defendants' acts unlawful.' *Daniel* [*v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 438 (2d Cir. 2005)] (internal quotation marks omitted)."[70]

In addition, the plaintiff must allege plausibly that he or she would be an efficient enforcer of the antitrust laws. On this point we consider

> "(1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries."[71]

"[T]he weight to be given these various factors will necessarily vary with the circumstances of particular cases."[72]

---

[70]

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013).

[71]

*Id.* (quoting *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290-91 (2d Cir. 2006) (internal citation omitted)).

[72]

*Paycom*, 467 F.3d at 291 (quoting *Daniel*, 428 F.3d at 443).

Finally, in addressing both antitrust injury and whether a plaintiff is an efficient enforcer of the antitrust laws, "a court must analyze whether a plaintiff's alleged injury constitutes injury to the competitive process . . . ."[73] The general rule is that "only those that are participants in the defendants' market can be said to have suffered antitrust injury."[74] This makes intuitive sense. Competitors and consumers have the clearest connection to a given defendant's anticompetitive conduct because they unlawfully may be forced to pay higher prices for the defendant's goods or services, deprived of their own business opportunities, or excluded from the market.   But, as explained in more detail below, others who are injured as a result of anticompetitive conduct may also have standing to sue.[75]

*Sufficiency of Relevant Market Allegations*

Defendants argue that Plaintiffs have failed plausibly to allege the relevant markets. They challenge the distinctions among Plaintiffs' alleged product markets, arguing that they "fail to plausibly suggest that ordering from a restaurant (or a restaurant receiving an order) is not a substitute for ordering the same meal from a restaurant (or a restaurant receiving an order) via Defendants' platforms."[76] This argument is without merit for purposes of this motion.

---

[73] *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 359 (S.D.N.Y. 2016).

[74] *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016) (internal citation omitted).

[75] *Id.*

[76] Def. Mem. (Dkt. 38) at 24.

Defendants do not challenge Plaintiffs' proposed distinction between the Takeout and

The Supreme Court recently held that "[o]nly other two-sided platforms can compete with a two-sided platform for transactions."[77]  Even if this did not settle the matter, Plaintiffs have pleaded facts adequately supporting the separate product markets.

Defendants contend that the cross-elasticity "between and among orders placed on platforms and direct delivery" dooms Plaintiffs' proposed market definition.[78]  Plaintiffs correctly point out that Defendants' argument on this point fails to account for the so-called *Cellophane* fallacy.[79]  But perhaps more importantly, the pertinent question is not whether there are any cross-elasticities at all between the separate markets, but whether the cross-elasticity of demand is *sufficient* to require viewing the purportedly separate markets as a single, unified market.[80]  Given the fact-intensive nature of this inquiry, courts, perhaps especially at the pleading stage, look also to "practical indicia" of the relevant market, including "industry or public recognition . . . , the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."[81]

---

Delivery Market and the Dine-In Market.  Even if they had, the Court is inclined to agree with Plaintiffs that a meal at a restaurant is not an interchangeable substitute for a takeout or delivery meal that a consumer will eat elsewhere.  *See* Am. Compl. ¶ 30.

[77]   *See Am. Express*, 138 S. Ct. at 2287.

[78]   Def. Mem. at 25.

[79]   Pl. Mem. at 13.

[80]   *See Todd*, 275 F.3d at 201.

[81]   *See Geneva Pharms.*, 386 F.3d at 496 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

These practical indicia support separate treatment for the proposed Restaurant Platform Market for substantially the reasons that Plaintiffs suggest. The amended complaint alleges plausibly that restaurant platforms "provide a service distinct from a restaurant's website or app (*e.g.*, a Domino's pizza app)" first and foremost because they aggregate the offerings of many restaurants in one place.[82] They also provide functionalities that restaurants do not, including search, the ability to write and read reviews, and automated recommendations based on the user's "preferences and other consumer reviews."[83] Restaurant platforms are "especially popular" with urban young professionals, "a distinct group of consumers with distinct preferences."[84] And industry analysts have characterized the Restaurant Platform Market as a separate market, indeed, characterizing it as "an oligopoly and calling for antitrust scrutiny."[85]

Moreover, Defendants' cited cases to the contrary are inapposite. While it indeed may be true that courts "have not hesitated to define separate markets based on how the same product reached the consumer," it does not follow that this Court therefore should decline to find well-pleaded Plaintiffs' alleged separate product markets for restaurant platform services and meals purchased directly from a restaurant. For example, the holding that "print books are an obvious substitute for e-books" in *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*[86] would be

---

[82]     Am. Compl. ¶ 28.

[83]     Pl. Mem. at 4; Am. Compl. ¶¶ 48-50.

[84]     Pl. Mem. at 4; Am. Compl. ¶ 52.

[85]     Am. Compl. ¶ 53.

[86]     985 F. Supp. 2d 612 (S.D.N.Y. 2013).

persuasive if, instead of comparing print books to e-books, the Court had found print books an obvious substitute for online book platforms.

Plaintiffs' allegations of national and local Restaurant Platform Markets also are sufficient. Defendants contend that the national market is implausible because they do not "compete for transactions" on a national basis.[87] But the facts alleged suggest that Defendants do compete nationally, and courts have recognized the existence of national markets even when market participants in some sense operate locally.[88] Defendants allegedly "compete to build a national network of consumers to offer restaurants, and a national network to offer consumers."[89] They also advertise, operate, charge the same commissions to restaurants and consumers, provide the same services on their websites and mobile apps, and impose the same NPCCs throughout the country.[90] They compete also for partnerships with national restaurant chains.[91]

*New York v. Deutsche Telekom AG*[92] is instructive.  There the parties agreed on a national market for retail mobile wireless communications services, but disagreed over the existence of separate local markets.  The court determined that both geographic markets were present. Although a consumer in one city is unlikely to seek wireless services provided out of another city,

---

[87]  Def. Mem. at 27.

[88]  *See United States v. Grinnell Corp.*, 384 U.S. 563, 575-76 (1966).

[89]  Am. Compl. ¶ 94.

[90]  *Id.* ¶ 95.

[91]  *Id.* ¶ 97.

[92]  439 F. Supp. 3d 179 (S.D.N.Y. 2020).

24

that carriers make decisions and set prices on a national basis is persuasive evidence of a national market that coexists with local markets.[93]

Having concluded that Plaintiffs have alleged sufficiently the relevant product markets, the Court proceeds to consider Plaintiffs' antitrust claims.

*Counts I and III*

Counts I and III allege that Defendants' NPCCs unreasonably restrain trade in the Direct Takeout and Delivery Market and the Dine-In Market in violation of Section 1 of the Sherman Act (Count I) and its state antitrust law analogues[94] (Count III).

A.      *Anticompetitive Effects*

Plaintiffs have alleged plausibly facts that, if proven, would be direct evidence of anticompetitive effects in the direct markets resulting from Defendants' NPCCs. This evidence is especially strong in regard to supracompetitive prices.[95]

---

[93]

*Id.* at 205.

[94]

Am. Compl. ¶ 209 (alleging Defendants' conduct violates Ariz Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases in Arizona; Cal Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California; D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia; Fla. Stat. § 501.201, *et seq.*, and *Mack v. Bristol-Myers Squibb*, 673 So. 2d 100, 104 (Fla. Dist. Ct. App. 1996), with respect to purchases in Florida; 740 Ill. Comp. Stat. 10/1[,] *et seq.*, with respect to purchases in Illinois; Mass Gen. Laws Ch. 93, § 1, *et seq.*, with respect to purchases in Massachusetts; and N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York).

[95]

*Am. Express*, 838 F.3d at 194.

Plaintiffs analogize Defendants' conduct to that at issue in *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,[96] in which Leegin, a leather goods manufacturer, imposed minimum resale prices on retailers that sold its products.   The Supreme Court held that this type of arrangement is subject to the rule of reason and offered certain considerations that may render vertical price restraints anticompetitive.  They include whether the restraints are imposed by the retailer rather than by the manufacturer, whether the retailer's market power is such that manufacturers cannot avoid them by "sell[ing] their goods through rival retailers," whether the restraint would prevent rival retailers "with better distribution systems and lower cost structures . . . from charging lower prices," and whether a large proportion of manufacturers is bound by the restraint or restraints.[97]

Although Plaintiffs' comparison of retailers to restaurant platforms and manufacturers to restaurants is somewhat strained, the facts Plaintiffs allege in support of their *Leegin* analysis paint a plausible picture of the anticompetitive effects allegedly caused by Defendants' NPCCs.  The NPCCs were propounded by Defendants,[98] who are not retailers but nonetheless consolidate and offer to their customers products from wide arrays of restaurants. Defendants therefore allegedly hold power over restaurants comparable to that which a retailer might wield over a manufacturer in the sense that both Defendants and a theoretical retailer serve as conduits through which the restaurant or manufacturer can offer its goods to consumers.  The amended complaint also alleges plausibly that restaurants cannot feasibly avoid doing business with

---

[96]

551 U.S. 877 (2007).

[97]

*Id.* at 892-94, 897-99.

[98]

Am. Compl. ¶¶ 55-61.

Defendants because restaurants need access to the platforms' customers – many of whom use only one platform due to platform "stickiness" – in order to generate sufficient sales to make up for their low margins.[99]  The NPCCs explicitly prevent restaurants from selling their goods at lower prices through "distribution systems with lower cost structures," *i.e.*, in the direct markets, where costs are lower because no commission rates are added to the list prices of restaurant meals.[100]  And Plaintiffs have pleaded facts supporting the proposition that "one or more Defendants' NPCCs restrain[s] more than half of the Direct Markets."[101]

All of this, together with Plaintiffs' well-pleaded allegation that Defendants' commission rates match or exceed most restaurants' profit margins, supports the reasonable inference that restaurants – being foreclosed from lowering prices in the direct markets to attract sales – have had no choice but to raise prices in both the platform and direct markets.  Plaintiffs' anecdotal and survey evidence permits an inference or conclusion that restaurant owners have done just that.[102]

---

[99]  *Id.* ¶¶ 75-80, 85-86.

[100]  *Id.* ¶¶ 140-41.

[101]  Pl. Mem. at 23; *see* Am. Compl. ¶¶ 82-83.

[102]  *See, e.g.*, Am. Compl. ¶¶ 142 ("As one Colorado restaurant owner explained, the '[c]ommissions are too high to maintain a profit,' so restaurants are forced to either raise prices to maintain a profit or lose money on delivery orders."); 144 ("[I]n 2019 the New York City Hospitality Alliance found that 64.1 [percent] of restaurants either raised menu prices or considered raising menu prices to offset fees from Grubhub."); 145 ("In Milwaukee, 'Alexa Afaro of the Filipino restaurant and food truck Meat on the Street said they've had to raise prices to help off set some of the additional costs of delivery commissions.'").

27

B.      *Antitrust Standing*

In order to bring their claims under Counts I and III, Plaintiffs must plead facts that allege plausibly that the direct classes have sustained antitrust injury and that they are acceptable plaintiffs to pursue the violation.[103]  Defendants contend that Plaintiffs have not adequately pleaded antitrust injury on behalf of the direct classes because any injury they suffered by purchasing meals at supracompetitive prices in the direct markets cannot be traced to Defendants' conduct in the Restaurant Platform Market.  According to Defendants, this is fatal because "a challenged restraint must harm competition in a market in which defendants compete."[104]  But in *Blue Shield of Virginia v. McCready,*[105] the Supreme Court held that the antitrust laws protect "parties whose injuries are 'inextricably intertwined' with the injuries of market participants."[106]

The *McCready* case arose from an alleged conspiracy entered into by Blue Shield and an association of psychiatrists to make psychologists ineligible for compensation for the provision of psychotherapy under Blue Shield's health insurance plans.  Plaintiff, an individual who was covered by Blue Shield health insurance, sued after her requests that Blue Shield reimburse her for a psychologist's services were denied.  The district court granted defendants' motion to dismiss because, in its view, McCready's injury "was to[o] indirect and remote to be considered 'antitrust

---

[103]

*AGC*, 459 U.S. at 535 n.31.

[104]

Def. Mem. at 10 (citing *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 238 (2d Cir. 2003)).

[105]

457 U.S. 465 (1982).

[106]

*Aluminum*, 833 F.3d at 158 (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 n.5 (9th Cir. 1999)).

injury.'"[107]   The Court of Appeals reversed and the Supreme Court affirmed, holding that the

plaintiff had antitrust standing because, despite being neither a competitor nor a direct customer of

Blue Shield or its coconspirators (her employer purchased the insurance coverage on the group

market, and she did not participate in the market for psychiatric services), she sustained antitrust

injury when she was forced to pay for psychotherapy that would have been reimbursable absent

defendants' anticompetitive conduct.[108]

        The Court emphasized that the plain language and policy underlying Section 4 of the

Clayton Act made clear that the statute "provides a remedy to '[a]ny person' injured 'by reason of'

anything prohibited by the antitrust laws."[109]   Section 4 nonetheless may not apply in cases that

present the danger of "duplicative recovery" or when the injury is "too remote" to be proximately

caused by the violation at issue.   But the Court found no potential for duplicative recovery in

McCready's case because she already had paid the psychologist, and her injury was not too remote

because it was "clearly foreseeable" to the alleged conspirators and, in fact, was "a necessary step

in effecting the ends of the alleged illegal conspiracy."[110]   McCready's alleged injury therefore was

"inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the

psychotherapy market," and cognizable under the antitrust laws.[111]

---

[107]
     *McCready*, 457 U.S. at 470-71 (internal citation omitted).

[108]
     *Id.* at 483-84.

[109]
     *Id.* at 484-85.

[110]
     *Id.* at 479.

[111]
     *Id.* at 484.

The Second Circuit has applied and reaffirmed the *McCready* rule in various cases. In *Crimpers Promotions Inc. v. Home Box Office, Inc.*,[112] the Second Circuit held that an organizer who claimed the defendant coordinated a boycott of its trade shows in order to prevent the defendant's suppliers and competitors from meeting and transacting business suffered antitrust injury.   The Court noted that, like Blue Shield and the organization of psychiatrists harmed McCready in order to harm the psychologists, HBO destroyed plaintiff's trade show as a "means to eliminate [its] competition."[113] And in *In re Aluminum Antitrust Litigation*,[114] the Second Circuit agreed that "the thrust of *McCready* is that the plaintiff was a participant in 'the very market directly distorted by the antitrust violation.'"[115] The "upshot" is that "sometimes the defendant will corrupt a separate market in order to achieve its illegal ends, in which case the injury suffered can be said to be 'inextricably intertwined' with the injury of the ultimate target."[116]

The amended complaint alleges plausibly that the direct classes' injuries in the direct markets similarly are "inextricably intertwined" with Defendants' allegedly unlawful anticompetitive conduct in the Restaurant Platform Market.   Plaintiffs plead that Defendants' NPCCs were designed to restrict competition that could result from restaurants offering lower prices

---

112

724 F.2d 290 (2d Cir. 1983).

113

*Id.* at 292.

114

833 F.3d 151 (2d Cir. 2016).

115

*Id.* at 160 (quoting *SAS of P.R., Inc. v. P.R. Tel. Co.*, 48 F.3d 39, 46 (1st Cir. 1995)).

116

*Id.* at 161.

in the direct markets.  Defendants allegedly force consumers to pay supracompetitive prices in the direct markets as a "means to eliminate competition" that would threaten their business.[117]

Thus, the Court holds that the direct classes have adequately alleged facts that support their claims against Defendants.  They plausibly have alleged antitrust injury under the Second Circuit's three-step analysis.[118]  They identify Defendants' imposition of NPCCs as vertical restraints of trade in violation of the Sherman Act, and they allege actual injury in the form of supracompetitive prices.  This injury is "of the type the antitrust laws were intended to prevent and flows from that which makes defendants' acts unlawful."[119]  The Court holds also that the direct classes would be efficient enforcers of the antitrust laws.  The injury they sustained by paying supracompetitive prices was direct.  Their interest in obtaining damages and/or injunctive relief against Defendants' anticompetitive practices likely would motivate them to pursue enforcement.  Their alleged injury is not impermissibly speculative, and there is no danger of duplicative recoveries to direct and indirect victims, as Plaintiffs are the direct victims of the alleged restraint and have already paid for their meals.

---

[117]

*Crimpers*, 724 F.2d at 292.

[118]

*Gatt*, 711 F.3d at 76.

[119]

*Id.* (quoting *Daniel*, 428 F.3d at 438).

*Counts II and IV*

On behalf of the Restaurant Platform Class, Plaintiffs allege that defendants Grubub and Uber's NPCCs unreasonably restrain trade in the Restaurant Platform Market in violation of Section 1 of the Sherman Act (Count II) and its state antitrust law analogues[120] (Count IV).

---

120

Am. Compl. ¶ 214 (alleging Defendants' conduct violates Ala. Code § 6-5-60[,] *et seq.*, which [*sic*] respect to purchases in Alabama; Alaska Stat. §§ 45.50.562, 45.50.576(a), (b), with respect to purchases in Alaska; Ariz Rev. Stat §§ 44-1401, *et seq.*, with respect to purchases in Arizona; Ark Code Ann. § 4-75-212(b), *et seq.*, with respect to purchases in Arkansas; Cal Bus. Code §§ 16700, *et seq.*, and Cal. Bus. Code §§ 17200, *et seq.*, with respect to purchases in California; D.C. Code Ann. §§ 28-4501, *et seq.*, with respect to purchases in the District of Columbia; Fla. Stat. § 501.201, *et seq.*, and *Mack v. Bristol-Myers Squibb*, 673 So. 2d 100, 104 (Fla. Dist. Ct. App. 1996), with respect to purchases in Florida; Hawaii Code § 480, *et seq.*, with respect to purchases in Hawaii; 740 Ill. Comp. Stat. 10/1[,] *et seq.*, with respect to purchases in Illinois; Iowa Code §§ 553[,] *et seq.*, with respect to purchases made in Iowa; Kansas Stat. Ann. § 50-101, *et seq.*, with respect to purchases in Kansas; Mass Gen. Laws Ch. 93, § 1, *et seq.*, with respect to purchases in Massachusetts; Me. Rev. Stat. Ann. 10, §§ 1101, *et seq.*, with respect to purchases in Maine; Mich. Comp. Laws Ann. §§ 445.772, *et seq.*, with respect to purchases in Michigan; Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases in Minnesota; Miss. Code Ann. § 75-21-1, *et seq.*, with respect to purchases in Missouri; Neb. Code Ann. §§ 59-801, *et seq.*, with respect to purchases in Nebraska; Nev. Rev. Stat. Ann. §§ 598A, *et seq.*, with respect to purchases in Nevada; N.H. Rev. Stat. Ann. §§ 356:1, *et seq.*, with respect to purchases in New Hampshire; N.M. Stat. Ann. §§ 57-A-A, *et seq.*, with respect to purchases in New Mexico; N.Y. Gen. Bus. L. §§ 340, *et seq.*, with respect to purchases in New York; N.C. Gen Stat. §§ 75-1, *et seq.*, with respect to purchases in North Carolina; N.D. Cent. Code §§51-08.1, *et seq.*, with respect to purchases in North Dakota; Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases in Oregon; P.R. Laws Ann. Tit. 10, § 257, *et seq.*, with respect to purchases in Puerto Rico; R.I. Gen. Laws § 6-36-1, *et seq.*, with respect to purchases in Rhode Island; S.D. Codified Laws Ann. §§ 37-1-3, *et seq.*, with respect to purchases in South Dakota; Tenn. Code Ann. §§ 47-25-101, *et seq.*, with respect to purchases in Tennessee; Utah Code § 76-10-3101, *et seq.*, with respect to purchases in Utah; Vt. Stat. Ann. tit. 9, § 2453, *et seq.*, with respect to purchases in Vermont; W. Va. Code §§ 47-18-1, *et seq.*, with respect to purchases in West Virginia; and Wis. Stat. §§ 133.01, *et seq.*, with respect to purchases in Wisconsin).

32

*A.      Anticompetitive Effects*

We begin by examining Plaintiffs' allegations of anticompetitive effects in the Restaurant Platform Market stemming from Grubhub and Uber's "wide" NPCCs, which set minimum prices *anywhere* restaurants sell meals, including on other restaurant platforms. The Court is persuaded by Plaintiffs' contention that the amended complaint sufficiently pleads direct evidence of anticompetitive effects in the platform market. Because this is a two-sided transaction market, Plaintiffs must allege anticompetitive effects resulting from the challenged restraint both for the Defendants' consumer and restaurant customers.[121]

The amended complaint alleges plausibly that Grubhub and Uber's NPCCs create supracompetitive prices for consumers. The distinction here is between restaurant list prices and platform commissions. Wide NPCCs prevent restaurants from offering lower list prices on other platforms. Because these list prices allegedly are "a key (and, in some cases, the only) component of the end-price paid by customers for goods ordered through Restaurant Platforms,"[122] it is plausible that Grubhub and Uber's conduct prevents restaurants from charging lower prices through less expensive channels of distribution.[123] It is reasonable to infer that the list prices consumers pay for platform orders are supracompetitive.[124]

---

[121]    *See Am. Express*, 138 S. Ct. at 2287.

[122]    Am. Compl. ¶¶ 59-61.

[123]    *See Leegin*, 551 U.S. at 893.

[124]    *See id.* ¶ 130.

Defendants' papers understandably highlight competition by other restaurant platforms. But despite challenges by new entrants and Doordash's position as the largest platform in the national market, Grubhub and Uber are alleged to have continued to raise their commission rates over time. According to its SEC filings, Grubhub's commission rate increased 156 percent between 2014 and 2019.[125] Plaintiffs allege that both Grubhub and Uber make profit margins of between 40 percent and 80 percent, depending on whether or not the restaurant provides its own delivery.[126] The Court does not decide whether Defendants have raised their rates and become more profitable because of improved services to customers or because of their alleged anticompetitive conduct. At the pleading stage, courts "may not pick and choose among plausible explanations" for these effects.[127]

In addition to supracompetitive prices, Plaintiffs allege plausibly that consumer choice has decreased due to Grubhub and Uber's NPCCs. High restaurant commission rates – which "flow" from the NPCCs – allegedly make it impossible for restaurants to "offer lower-margin items through Defendants' platforms."[128] Plaintiffs plead also that these restraints shield Grubhub and

---

[125] *Id.* ¶ 118.

[126] *Id.* ¶¶ 120-21.

[127] *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 669-72 (S.D.N.Y. 2016).

[128] Am. Compl. ¶ 139.

Uber from competitive pressures to improve their technology[129] and offer quality customer service.[130]

Plaintiffs plead facts that support their claim that these anticompetitive effects are felt throughout the relevant markets.  Because the NPCCs allegedly bind all restaurants that list their menus on Grubhub and Uber regardless of what volume of transactions they do on each platform, the relevant metric through which to assess the agreements' impact is how many restaurants in each market are listed on the platforms.  Plaintiffs plead ample facts suggesting that very large numbers of restaurants are listed on Grubhub and Uber, at both the national and local levels.  "[A]pproximately 77 [percent] of all restaurants in the United States that offer delivery do so through Grubhub, and more than a quarter . . . do so through Uber and Postmates."[131]  "[M]ore than half of the restaurants in each Local Market . . . are on Grubhub."[132]  And for the local markets for which Uber data is available, the lowest percentage of total restaurants on Uber is 19 percent in Los Angeles, and in San Francisco it reaches 93 percent.[133]  Plaintiffs contend that these percentages

---

[129]
    *Id.* ¶ 135.

[130]
    *Id.* ¶¶ 137-38.   Plaintiffs allege also that Grubhub and Uber provide poor service to restaurants.  *Id.* ¶ 136.

[131]
    *Id.* ¶ 81.

[132]
    *Id.* ¶ 82.

[133]
    *Id.*

would be even higher in a sample of restaurants that included only restaurants that list their products on restaurant platforms.[134]

Plaintiffs also plead direct evidence of harm to restaurants in the form of supracompetitive prices. For much the same reasons as described above, it is plausible that Grubhub and Uber's NPCCs both discourage rival restaurant platforms from offering lower commissions and allow Grubhub and Uber cover to raise their own rates. And because of indirect network effects, platform "stickiness," and the restaurants' need to access as many potential customers as possible in order to stay in business, it is reasonable to infer that restaurants have no choice but to accept Grubhub and Uber's NPCCs.

### B.    *Antitrust Standing*

Defendants have not challenged Plaintiffs' antitrust standing to bring suit on behalf of the Restaurant Platform Class against Grubhub and Uber on Counts II and IV. But the Court addresses the issue for the sake of completeness. Plaintiffs who have purchased meals from restaurant platforms in the relevant markets are alleged to have suffered injury in fact and antitrust injury because they paid supracompetitive prices – an injury "of the type the antitrust laws were intended to prevent and that flows from" defendants' unlawful acts[135] – due to Grubhub and Uber's unlawful restraints. The amended complaint alleges plausibly also that Plaintiffs are likely to be efficient enforcers of the antitrust laws because they suffered direct pecuniary injury that will

---

[134]

*Id.*

[135]

*Gatt*, 711 F.3d at 76 (quoting *Daniel*, 428 F.3d at 438).

motivate them "to vindicate the public interest in antitrust enforcement,"[136] their injury is concrete rather than speculative, and Plaintiffs' status as direct victims of the unlawful restraint who have already paid for the products at issue would likely mitigate any potential for duplicative recoveries.

The Court, having concluded that Plaintiffs plausibly have alleged claims under Counts II and IV, considers Defendants' arguments in favor of dismissing Plaintiffs' state law claims under Counts III and IV.


*State Law Antitrust Claims*

In Counts III and IV, Plaintiffs allege state law antitrust violations under the laws of 32 states and U.S. territories.[137] Defendants contend that these claims should be dismissed because Plaintiffs have failed to state a claim under the Sherman Act, their "pleading is completely devoid of any allegations concerning *26 of the jurisdictions* under whose laws they purport to sue," and Plaintiffs "have not sufficiently alleged that they can bring a claim in their individual capacities for violation of any of the state laws listed in Counts III and IV."[138]

Defendants' first argument fails because the Court holds that Plaintiffs have plausibly alleged their federal claims. And Defendants' additional arguments misapprehend the law. The amended complaint alleges unlawful activity in every relevant jurisdiction, and indeed throughout

---

[136]

*Id.*

[137]

Am. Compl. ¶¶ 209, 214.

[138]

Def. Mem. at 27-29.

the country.[139]  "[W]hether a plaintiff can bring a class action under the state laws of multiple states is a [class certification] question . . . not a question of standing . . . ."[140]  It therefore does not affect the outcome of this motion that Plaintiffs have alleged only the purchase of restaurant meals in New York.[141]  The Court concludes that Plaintiffs' state law claims survive the motion to dismiss.

### Conclusion

For the foregoing reasons, Defendants' motion to dismiss (Dkt. 37) is denied in its entirety.

SO ORDERED.

Dated: March 30, 2022

Lewis A. Kaplan
United States District Judge

---

[139]    Am. Compl. ¶¶ 31-34.

[140]    *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 96 (2d Cir. 2018).

[141]    The Court accepts Plaintiffs' contention that it can be reasonably inferred from the amended complaint that Plaintiffs purchased meals "in at least New York," given they all reside in that state.  *See* Pl. Mem. at 34.